## No. 14,001.

R. D. DAVIES ET ALS. VS. MONROE WATER WORKS AND LIGHT COMPANY, ET ALS.

| 107 | 145 |
| 109 | 661 |

| 107 | 145 |
| f124 | 665 |

### SYLLABUS.

#### ON MOTION TO DISMISS.

1. In case of doubt, the doubt will revolve itself in favor of the appeal. The sufficiency and competency of the surety was a proper subject for inquiry in the District Court.
2. The return of appeals in matter relating to the appointment of receivers, under Statute 1898, is governed by special provision of that statute.
3. The lack of an affidavit to show interest of the appellant affords no ground to dismiss the appeal where the interest is admitted by all the parties to the appeal.

#### ON THE MERITS.

The management of the company brought it within the terms of the Statute 159 of 1898. A receiver was appointed by the District Court, and the court's action in this respect is affirmed, subject to the rights of creditors under Section 10 of Statute 159 of 1898.

#### ON APPLICATION FOR REHEARING.

1. It is good ground for the appointment of a receiver to a corporation when it appears that the directors or other officials are jeopardizing the rights of stockholders or creditors, by grossly mismanaging the business, or by committing acts *ultra vires,* or by wasting, misusing or misapplying the property or funds of the corporation; or, when it appears that a

majority of the shareholders are violating the charter rights of the minority and putting their interests in imminent danger.

2. It is for the court to determine whether or not the showing made justifies and makes advisable the appointment of a receiver.

3. The appropriate place for officials in charge of the business of a corporation is the domicil of the company. If they live away from its domicil, they have no right to charge the company for traveling expenses to and fro between their homes and the domicil of the company.

4. Officials and majority shareholders have no right to extend favors to certain of the shareholders at the expense of the corporation, or of the body of tne shareholders.

5. The provision of the charter requiring *thirty* days' previous notice to be given to stockholders of a meeting called to consider the question of the dissolution and liquidation of the corporation is held to be mandatory.

6. It will not do to say that because a corporation may be insolvent and nothing be eventually coming to the stockholders, they are without interest to take action to prevent abuses.

7. Where a case for a receivership is otherwise made out, it is no sufficient ground for denying the application that it will entail large costs and expenses. The courts of Louisiana will not permit the spoliation of estates and corporations in the way of the allowance of exhorbitant charges for commissions, fees, costs, etc.

APPEAL from the Sixth Judicial District, Parish of Ouachita.— Hall, J.

*Andrew Augustus Gunby* and *E. Tylor Lamkin,* for Plaintiff, Appellee.

*Hudson, Potts & Bernstein,* for Defendants, and Intervenors, Appellants.

The opinion of the court was delivered by BREAUX, J.
On rehearing by BLANCHARD, J.

## ON MOTION TO DISMISS.

BREAUX, J. Plaintiffs and appellees moved before this court to dismiss the appeal on a number of grounds.

First, because no appeal bond has been filed as required. The two documents purporting to be appeal bonds filed by the defendants, the Monroe Water Works and Light Co. *et als.,* are signed by L. D. McLain who is one of the defendants and appellants.

Second, because the defendants' and intervenors' order of appeal is made returnable before the expiration of fifteen days from the date of the judgment, in contravention of Statute 92 of July 10th, 1900, which declares that the judge shall fix the day in the order granting the appeal, which shall not be less than fifteen days nor more than sixty days from the date of the order, except by the consent of the parties.

Third, because appellants have not complied with the provisions of Section 4 of Statute 159 of 1898, which requires that one appealing from an order appointing a receiver shall make affidavit to his interest in such appointment.

With reference to the facts bearing on the first ground for dismissal, it does appear that L. D. McLain is a party defendant and a party intervenor. The intervention, as it appears on the face of the judgment appealed against, was dimissed. With reference to the facts bearing on the second ground for dismissal, the orders of appeal were made returnable according to law. And, with reference to the facts upon which the third ground is based, no affidavit was taken by any one applying to this court.

Taking the first ground for decision, the court finds that there are a number of decisions in which it is held that questions relating to the sufficiency of the bond and the competency of the surety on the bond, both as relates to identification and competency, should be decided contradictorily before the court a qua. In view of the fact that questions should be decided in favor of sustaining the appeal where there is the least doubt, the court decides to adhere to the ruling as laid down in the following cases: Edwards vs. Edwards, 29 An. 599; Succession of Charmbury, 34, A. 21; Surget vs. Stanton, 10 A. 318; Wood vs. Harrell, 14, A. 61; Vredenburgh vs. Behan, 32 A. 475, and not to consider the construction in Barrow vs. Clack, 45 A. 478, as applying. This disposes of the first ground to dismiss.

As relates to the intervenors, no question for dismissal arises on this point. An appeal bond was furnished by the intervenors, not objectionable in any way.

As relates to the second ground of the motion to dismiss, that is, that the return day should have been fixed by the court, under the Statute of 1898, we can only say that the Statute of 1900 relating to

appeals generally controls in all cases not governed by special rule. A general law does not repeal a special statute, unless its terms are such as to make it appear evident that the intention was to repeal the special statute. Repeal by implication is not presumed.

As relates to the intervenors, they have furnished an appeal bond to which not the least objection has been urged.

With reference to the next objection made to the appeal in the motion to dismiss, the lack of the affidavit affords good ground for dismissing the appeal, appellees urge. The Statute 159 of 1898 provides that one who, by affidavit, appears to be interested, may appeal by furnishing bond as required. We think persons not parties to the proceedings are referred to and not those who are parties to the suit, whose interests are admitted by all parties to the litigation. The purpose in requiring the affidavit is to compel the appellant to swear that he, though not a party, has interests involved which afford him a right to be heard. The affidavit of one whose interest is admitted would be an entirely useless formality, as it would add nothing to that which has already been ascertained.

For these reasons, the motion to dismiss the appeal is denied.

## ON THE MERITS.

Plaintiffs seek to have a receiver appointed to take charge of the defendant company. The defendant company was organized in 1892 for the purpose of building and operating water works and electric lights in the City of Monroe, and since that year they have been operated by that company. Stock was issued based on the asserted value of the franchise granted by the City Council of Monroe to construct and operate a system of water works and electrict lights for the term of thirty years. The capital stock of the company was fixed at one hundred and twenty-five thousand dollars. No amount having been paid by the stockholders, it became necessary to issue bonds secured by mortgage on the plant, in favor of the Manhattan Trust Co., of New York, trustee for the holders of the bonds. They bear six per cent. interest and are payable in thirty years from their date.

These bonds were sold, and the amount they brought, less discount and commission, was used in paying for the defendant company's water works and electric light plant.

The Board of Directors, elected at a meeting of a majority of the stockholders, consisted of three members. In January, 1893, W. E. Hawks and Samuel B. Hawks, being a quorum of the Board of Directors, met and elected the former as president and the latter as secretary. Irving E. Gibson was elected vice-president. At this meeting it was voted that the Manhattan Trust Company of New York deliver to W. E. Hawks the issue of one hundred thousand dollars, to which we have before referred. It was also voted by these two members at this meeting to pay to the President and Treasurer a salary of two thousand dollars per annum, and all expenses incurred while acting in his official capacity. The following May a majority of the stockholders met at the office of the company to elect a board of directors for the year. The same directors were re-elected and they re-elected the same officers. A resolution was adopted at this meeting of the stockholders ratifying every action taken by the directors, W. E. Hawks and S. B. Hawks, at the meeting held by the directors, to which we have just referred. In November, 1896, at a special meeting of the Board of Directors the President said that during the past three years it became necessary to make extensive improvements, additions, and extensions to the plant at a cost exceeding the revenues; that the floating debt of the company, in consequence, amounted to the sum of sixty thousand three hundred and fifty 45-100 dollars. He, it is stated in the minutes of the meeting, presented an itemized statement and account of the company's expenditures, which was discussed, and the amount approved, and measures were taken to liquidate the debt.

A large majority of the stockholders met, after notice to interested parties. It was voted to approve and ratify the action of the Board of Directors in having authorized the President to issue bonds to an amount not exceeding one hundred thousand dollars, maturing in thirty years, secured by a second mortgage on the company's property. This was the second issue of bonds. We understand that the bonds were issued and negotiated. The selling price of the bonds, as ordered by the Board of Directors, was to be not less than eighty cents on the dollar.

In the year 1900, at a meeting of the Board of Directors, the advisability of selling the plant was discussed and resolutions adopted to that end. The year following the subject of selling was again taken up, and the price and the terms of sale were agreed upon, with the town of Monroe, which was to become the vendee of the defendant

company. Commissioners were appointed and other steps taken looking to a final liquidation of the company's affairs.

The same day that this meeting was held, and before it was held, plaintiffs' injunction was duly served, enjoining the company from selling the property as proposed. Among the grounds of complaint urged by plaintiffs they specially charge that the President has mismanaged the affairs of the company, and that he has neglected the plant; that he has misapplied the funds, and that he has made no statement of the business; that he has kept the books of the company at his home, in a distant State, and was conducting the affairs of the company there; that he has committed a number of acts *ultra* the charter, and that their interests as a minority of the stockholders are in imminent danger.

Defendants and intervenors controvert the allegations of plaintiffs' petition and aver that the management of the President and other officers was proper and affords no ground for criticism; that the sale proposed was in the interest of all concerned; that the sole idea was to liquidate the affairs of the company in the manner provided in the charter, and pay the debts; and that the city caused the plant to be appraised by an expert engineer and offered eight thousand dollars more than the value fixed by the expert.

The Judge of the District Court annulled all the proceedings of the stockholders and directors held on April 1st, 1901, looking to the sale of the property and at which commissioners were elected. He appointed a receiver to take charge of the property and business of the company, and directed the receiver to hold, administer, and operate the plant for the benefit of the creditors and stockholders. He dismissed the intervention in question. It is from this judgment that the intervenors appeal.

Plaintiffs have arraigned the management of the company from the beginning of the term of office of the President, in 1893, to date. The salary of the President, and the amounts expended by him, for which he charged the company, although he was at his own home and not rendering service to the corporation at its domicile, are grounds for plaintiffs' attack.

The salary of the absent President, on the one hand, for his services, though an absentee, were surely ample enough. The indebtedness increasing annually suggests that there were no net revenues. The

President had just such control as he chose to have. Each stockholder, however limited may have been his interest, had the right to look to him for favorable results. Meeting with disappointment in this respect, it created some dissatisfaction on the part of plaintiffs, who now not only complain of the salary charged, but stoutly criticise the President for charging lump sums for traveling and other expenses incurred, he avers, in the interest of the company.

Among the items of charges are amounts for traveling and other expenses from his northern home to Monroe once a year to remain only a few weeks, although, in view of the salary, he owed careful supervision and personal attention for at least the greater portion of his time.

The President, from all appearances, controlled or owned the first of the issues of bonds made by the company. We infer that he was its creditor for a large amount. There was no progressive decrease of the indebtedness. The interest and the capital remained unchanged until 1896. In that year an issue of bonds as large as the first was voted by the Board of Directors and approved at the meeting of the stockholders. True, under the charter of the company, the Board of Directors, with the approval of the stockholders, had the authority to issue bonds. This authority we do not understand plaintiffs to question, but the amount of the issue is the cause of plaintiffs' complaint.

Plaintiffs also inveigh against the President's management on the ground that he has neglected to keep up the plant; that in consequence of the neglect of the works it has greatly decreased in value. The testimony on this point is conflicting, yet it must be concluded that the machinery and other property of the company was not in a first-class condition. The testimony of an expert who had closely inspected the plant sets forth that part of the works was not in good order or condition.

Plaintiffs also charge that there was a neglect in supplying water and light, and that in consequence the consumers were considerably fewer in number than they would have been had the service been better.

Plaintiffs call attention to the fact that although the bonded indebtedness amounts to two hundred thousand dollars, yet it was proposed to sell the whole plant for about seventy-five thousand dollars.

An agreement was entered into about the year 1892, between the defendant company and the City of Monroe, by which the latter secured an option to become the owner of the plant at its value to be ascertained

in the manner set forth in the agreement. The time fixed for the exercise of this option is not far distant. It is said that the City of Monroe is taking steps looking forward to availing itself of this option. Besides, a statute of the State grants power to municipalities to expropriate property such as that owned by the defendant company. Plaintiffs urge that the statute is not one that can possibly confer a right of expropriation, as, it contends, defendants have acquired a vested right. None the less, defendants are apprehensive that there will be expensive litigation, which they desire to avoid and to the possibility of which they point as a reason for justifying the sale. Be this as it will, we will not anticipate issues which, perhaps, in the interest of all concerned, will be avoided. To our minds, a point has been reached rendering it necessary to change the present situation.

Whether the settlement should be made in accordance with the terms of the charter by the commissioner and the President, or the settlement and liquidation should be conducted by a receiver, gives rise to questions not free from difficulty in the solving. We are confronted by a condition, we think, recognizing the rights of the one or the other to act. We understand that the receiver is virtually in charge. In view of this fact and for the reason that, under proper and economical administration of its affairs by the receiver, and none other should be contemplated, and we have no reason to infer that any other is in contemplation, justice will be done to all the claims. The day of receiver's extravagance and of ill-advised steps in liquidating property in their charge is of the past. We believe that the spirit of the law requires the utmost circumspection and care on the part of all those placed in the management of business which is, we may say, placed directly under the eye of the court.

We take it that no one will dispute the proposition that property of a corporation is not to remain in the hands of a receiver after there is no reasonable ground to believe that the property of the corporation cannot be so administered as to pay its debts. Sec. 10 of Statute 159 of 1898. This section is imperative in its terms and is not to be defeated by injunction or other proceedings instituted to place the property in the hands of a receiver or to enjoin a contemplated sale. In other words, the administration must be temporary, if, at the instance of creditors, the case is brought within the terms of the section of the cited statute.

The shareholders, however their interests may be limited, are entitled to an accounting, and that is about the extent of the possibility of the judgment appealed from, should it be made to appear that the property should be disposed of and a final settlement made. To ascertain this, the order of sale of the property and the distribution of the assets cannot give rise to damaging expense.

For reasons assigned, the judgment appealed from is affirmed at appellants' costs.

PROVOSTY, J., dissents from the judgment on the merits.

## ON APPLICATION FOR REHEARING.

BLANCHARD, J. Plaintiffs—thirteen in number—are minority shareholders in the defendant company, and their holdings aggregate 159 shares out of a total of 1,250 shares. The shares are each of the par value of $100.00.

It appears that when the corporation was chartered and the shares subscribed for, not a dollar of the subscription was paid in cash at that time, nor at any subsequent time, and no notes or other evidences of debt for amounts subscribed were taken. In a word, none of the subscriptions were ever paid, nor was it ever contemplated, it would seem, that they should be paid. This is not the way to launch corporations upon the business world in the State of Louisiana, nor was it at the time this company was organized. This is said, merely, in passing.

The application for the appointment of a receiver is based on Act No. 159 of 1898, and the parts of the act immediately pointed to as authorizing the action taken are paragraphs 2 and 11 of Section 1.

The first is to the effect that the court may, at the instance of any stockholder or creditor, appoint a receiver to take charge of the property and business of a corporation when the directors or other officers of the corporation are jeopardizing the rights of stockholders, or creditors, by grossly mismanaging the business, or by committing acts *ultra vires,* or by wasting, misusing, or misapplying the property or funds of the corporation; and the second is to the effect that a receiver may be appointed at the instance of any stockholder when a majority of the stockholders are violating the charter rights of the minority and putting their interests in imminent danger.

The question presented is whether or not a case is made out, under these provisions of the law, justifying and making advisable the appointment of a receiver.

The District Judge held there had been. Our conclusion on the first hearing was the same, and on this second hearing and consideration we are constrained to confirm it.

The corporation was chartered in 1892; its domicil was Monroe, Louisiana; its business to supply water service and electric lights to the town and the inhabitants thereof.

Bright & Gravely were awarded the contract to supply the materials and construct the works. This they agreed to do for one hundred thousand dollars, for which first mortgage gold bonds, running thirty years with 6 per cent. per annum interest, were to be issued by the company and delivered to them.

They enlisted William E. Hawks of Bennington, Vermont, in the enterprise, and through his aid the works were constructed. The bonds were issued and turned over to Hawks, together with a large majority of the stock.

In fact, Hawks, his son, and a few associates, to whom were transferred some shares of stock, became the Water Works and Light Company, supplanting the original incorporators and holders of stock, with the exception of plaintiffs herein, who, as we have seen, hold only 159 shares of the 1,250 issued.

Hawks became President and Treasurer of the Company; his son Secretary, and these, together with one other, chosen by Hawks, constituted the Board of Directors.

The affairs of the corporation have thus been under the sole control and management of Hawks from about the year 1893 down to the present time.

He, too, was its creditor, for the mortgage bonds that had been issued and from the proceeds of which the works had been constructed, had passed into his hands.

We find that beginning, when Hawks took charge in 1893, with this indebtedness of one hundred thousand dollars of bonds, the liabilities of the corporation had so increased that when the present proceeding was initiated in April 1901, they aggregated, according to the figuring of Mr. Hawks, more than $229,000.00.

This represented the first mortgage bonds ($100,000), a second series of bonds, known as the second mortgage bonds, for the same amount,

which he had caused to be issued, and which he had absorbed in payment of a floating indebtedness incurred under his administration and due to him, and the remainder represented a still further floating indebtedness outstanding against the corporation and likewise due to Hawks.

No sufficient enlargement of the plant or extension of its scope appears to have been made in the eight or nine years of Hawks' administration to justify this more than doubling of the indebtedness with which the concern started out.

Neither does it appear that extensive repairs or betterments are responsible for the large increase, for it is shown by the evidence that the works had not been maintained at a high standard of efficiency, that their condition when the case was tried was by no means what it should have been, and that a competent expert employed for the purpose of examination and report had estimated the deterioration to be as great as 33 1-3 per cent.

Nor was it necessary to increase the indebtedness to meet the running expenses of the plant. It was more than self-sustaining. Its annual   revenues exceeded its annual expenses. The receipts are shown to have averaged about $20,000.00 a year from 1896 to the time of the filing of this suit, and during all the years Hawks controlled the corporation its revenues from water and light rentals and dues aggregated about $140,000.00.

Our examination of the charges found upon the books of the corporation kept by Hawks, and going to make up the large increase of indebtedness referred to, has satisfied us that much of the same would not stand the test of judicial scrutiny were it applied.

For instance, while the domicil of the company is fixed in its charter at Monroe, there are found upon its account many items for traveling expenses from his home in Vermont to Monroe to attend to the business of the corporation and to participate in the meetings of its stockholders and directors.

The same is true of his son, who was a director and the secretary of the company. His traveling expenses from Vermont to Monroe through eight or nine years are likewise entered up as legitimate charges against the company. These items aggregate a large sum.

The father was on the rolls as a paid official, to whom a salary of $2000.00 a year as President and Treasurer was voted. This salary was fixed to be paid him at a meeting of the Board of Directors held in Ben-

nington, Vermont, at which only the father and son were present. The minutes of that meeting are dated at Monroe, but it is shown that the meeting itself was held in Vermont.

If the father and son lived in Vermont for their convenience, their traveling expenses to the place of domicil of the Company, to attend stockholders' and directors' meetings and to look after the affairs of the Company, were not legitimate charges against the corporation. The appropriate place for officials in charge of the business of a corporation is the domicil of the Company. If they live away from its domicil they have no right to charge the Company for traveling expenses to and fro.

There are other items of expense on the account against the Company, such as overcharges of discount, interest, expenses relating to services rendered by Hawks to Bright & Gravely, etc., which go unduly to swell its aggregate.

The charter provides that the office of Treasurer shall be combined with that of Secretary. Yet William E. Hawks caused himself to be elected as President and Treasurer. He blended in himself the two offices, whereas the direction of the charter is otherwise.

The Treasurer's office was in Vermont, and his books were kept there. So, also, the stock books of the corporation and the seal of the Company were kept there. And it is reasonably certain that the funds of the Company, or a large part thereof, were kept in Vermont. Bills were sent on for inspection and payment there.

These are objectionable features in the conduct of the business of this corporation.

The charter provides that directors shall be chosen from among the stockholders. Yet it appears that in 1893 S. B. Hawks and I. E. Gibson were elected directors before they had become shareholders, and, afterwards, they were made eligible by the transfer to them by William E. Hawks of a share of stock each, which transfer was ante-dated by his direction.

But before their eligibility was thus assured, one or more meetings of the Board of Directors had been held whereat important business of the corporation had been transacted.

Subsequently, at a stockholders' meeting held at the domicil of the Company, in May 1893, prior acts of the Board of Directors were, in general terms, approved and ratified, and this is pointed to by defendants as curing anterior irregularities. But the testimony of W. A. Bright, one of plaintiffs, and the only one of the plaintiffs present at

the ratifying meeting, shows that the minutes of the previous action, referred to as ratified, were not read to the meeting, nor was it explained what that action was.

These are matters, however, of small moment, particularly so because they relate back to a period as remote in the affairs of this corporation as 1893.

We find that continuously through the years that Hawks has controlled the corporation, down to the present time, certain shareholders, acting with and for him, have been the recipients of favors from the Company in the way of water service and electric lights free of compensation. No charges were made against them; no bills presented; no payments demanded. They were apparently on the free list. Dues for service so rendered gratuitously would amount to a large sum in the aggregate. Plaintiffs knew nothing of this.

It was a discrimination, against which they may justly complain. Officials and majority stockholders have no right to extend favors to certain of the shareholders at the expense of the corporation, or of the body of the stockholders.

In November 1896 the Board of Directors authorized the issuance by the Company of one hundred thousand dollars of second mortgage bonds. It was explained by the President that a floating indebtedness of over $63,000.00 existed which should be liquidated. It is not made clear what part of this indebtedness, if any, was incurred for improvements, additions, or extensions of the plant.

The President, William E. Hawks, was authorized to sell a sufficient amount of the bonds to settle the floating indebtedness at a price not less than eighty cents on the dollar. It seems he disposed of them all and is now the holder of the bonds and the creditor of the Company for the full amount thereof.

The same day the directors' meeting, which authorized this issue of bonds, was held, a meeting of stockholders was also held. Four stockholders only were present. They were Hawks, his son, and two others acting with and for him—the four representing 984 shares out of the 1250. None of the plaintiffs were present, and the only notice of the meeting which appears to have been given was ten days' publication in a newspaper in Monroe.

This meeting ratified the action of the directors in authorizing the issuance of the $100,000.00 second mortgage bonds.

Plaintiffs contend that this action of the majority shareholders was *ultra vires;* that the charter of the Company must be construed with reference to the laws in force when it was adopted; and that at that time Act No. 80 of 1890, and other statutes in force, limited the issuance of bonds by waterworks and light companies to purposes of construction, repair, or acquisitions of property, or franchises.

They also contend that when the bonds were authorized to be issued nothing was due for construction, repairs or acquisitions of property, and that no part of the floating debt then due had been contracted for such purposes.

It is not our purpose to here pass definitely on these contentions. Whatever rights the holders of these bonds may have under the law is reserved to them. But we do say that the suggestion of their *ultra vires* character comes with a force sufficient, united with the other circumstances herein set forth, to justify the receivership sought.

In September 1900, a meeting of the Board of Directors was held whereat a resolution was adopted authorizing the President and Secretary to sell and convey to a New Jersey corporation, known as the, Monroe Water Works & Light Company of Jersey City, New Jersey, the entire plant, works, franchises and everything pertaining to the Monroe Water Works and Light Company of Monroe, Louisiana.

On the same day a meeting of stockholders was held. This meeting, assembled pursuant to fifteen days' notice published in newspapers in, Monroe. The notice announced the meeting was called to consider the question of selling the plant and property of the Company.

The only shareholders present in person were Hawks and his son, and two others acting with and for them. There was present by proxy, held by Hawks, three others whose holdings of stock aggregated 67½ shares. These also were in the Hawks interest.

Twenty-one other shareholders, aggregating 236 shares, were not present and no notice, other than newspaper publication, was given them.

This meeting ratified the action of the directors ordering the sale of the property to the New Jersey corporation.

This New Jersey corporation had been organized by Hawks and his friends for the purpose of absorbing the Louisiana corporation. It was really Hawks and his friends, organized into a foreign corporation, proposing to buy from Hawks and his friends, organized and holding property as a Louisiana corporation.

It is explained in the evidence, on behalf of defendants, that the purpose of accepting the proposition of the New Jersey Company was to change the domicil of the Louisiana corporation in order that, in case of legal proceedings, which were apprehended, taken by the City of Monroe to expropriate the plant and works, the jurisdiction of the Federal Courts in Louisiana could be invoked and longer delays in reaching final results could thereby be had than was considered possible in the State Courts.

But whatever the purpose, the facts substantiate the averments of plaintiffs' petition that defendants were seeking to remove the assets of the Company beyond the jurisdiction of the State courts.

Besides, it will be noted that the public newspaper notice of the meeting of stockholders, called to authorize this sale to the New Jersey corporation, stated the question to be considered was the selling of the plant and property of the Company. This meant, of course, the dissolution of the Louisiana corporation in the event of the sale to the New Jersey corporation.

Yet the eighth article of the charter of defendant Company expressly provides that the act of incorporation may be dissolved by the assent of three-fourths of the stock represented at a general meeting of the stockholders convened for that purpose *after thirty days' prior notice of such meeting shall have been given by the Secretary and Treasurer by mail to each shareholder.*

The meeting referred to was held after fifteen days' notice only, and that, too, published only in newspapers. There was no mailing of notices to the stockholders.

This was a palpable violation of the charter rights of the minority stockholders and a putting of their interests in imminent danger—grounds for the appointment of a receiver by the very letter of the Act of 1898.

Some six months following the meeting held as aforesaid, at which it was resolved to sell out to the New Jersey corporation, another meeting of stockholders was called.

Notice was given of this meeting by publication for thirteen or fourteen days in a newspaper at Monroe. This notice recited that the meeting was called "for the purpose of considering the sale of the water works and light plant and property of the Company to the City of Monroe, and dissolving the company and liquidating its business and affairs." Notice of the meeting appears also to have been mailed to

each stockholder, and these notices to the shareholders recited that the action to be taken meant the dissolution and liquidation of the corporation.

The meeting took place April 1, 1901. There were present in person William E. Hawks, his son, and the two parties who were acting with them. There were present by proxy held by the Hawks three other shareholders who represented between them 67 ½ shares. The number of shares represented in person and by proxy was 1014. Twenty-one shareholders, aggregating 236 shares, were not present. All of the plaintiffs herein were of those not present.

At this meeting resolutions were adopted for the sale to the City of Monroe of all the plant, works and property, real and personal, rights and franchises, including a claim of the Company against the City of Monroe for lights and water furnished the city, for the aggregate sum of $75,000.00. Three liquidators were appointed to wind up the affairs of the corporation, who, with the President, were authorized to make conveyance of the property to the City of Monroe.

On the same day a meeting of the Board of Directors was held and a resolution was adopted by that body ratifying and endorsing the sale, as proposed by the stockholders, to the City of Monroe.

It will be observed that this meeting of stockholders and directors took direct action not only to sell out the corporation and all its property and rights to the City of Monroe, but also for its dissolution and liquidation. It will also be observed that it was proposed to do this after less than fifteen days notice of the meeting given to stockholders.

Yet Articles 7 and 8 of the charter distinctly require thirty days prior notice of a meeting for such purpose, to be given each shareholder through the mails.

These provisions of the charter are mandatory, and for the holders of the majority stock to attempt to sell out the corporation, dissolve and liquidate it in disregard of the same, was a usurpation of authority, and an infringement of the rights of the minority shareholders.

Besides, the minority stockholders, plaintiffs herein, complain at the price at which it was proposed to sell to the City of Monroe, and point to an estimate of the value of the plant, works, etc., made by an expert employed by the President of the Company, and brought from New York for the purpose a short time before, which estimate was very largely in excess of the sum offered by the City of Monroe.

We are not deciding that the price at which the City of Monroe pro-posed to buy the works is an adequate one. It may be it is the full value of the same. But after the estimate made as aforesaid plaintiffs are not without grounds for questioning the action of the holders of the majority stock.

Especially is this so when according to defendant's contention the plant and works of the Company have cost over two hundred thousand dollars—two issues of mortgage bonds of one hundred thousand dollars each, besides an outstanding floating indebtedness now due of over $25,000.00; and they further contend that the works and plant have been all the time maintained in a good state of repair and preser-vation, and not allowed to waste, or deteriorate, or decay.

On the whole, we think abundant justification is found in this record for the action of the trial judge in appointing a receiver. Indeed, we agree with him that the situation, from the standpoint of advisability and even necessity, required this action. It was a prudent and con-servative step to take.

It will not do to say that because a corporation may be insolvent and nothing be eventually coming to the stockholders, they are without interest to take action to prevent abuses. Such a doctrine would permit the holders of the majority stock to wreck a corporation and, when the holders of the minority stock ask the court to intervene, to forestall the action of the court by proclaiming the insolvency of the company and the consequent lack of interest in the outcome on part of those seeking the court's action.

Defendants contend for the right of stockholders to dissolve and liquidate the corporation pursuant to the direction of the charter, and urge that this right should not be defeated by the appointment of a receiver.

True, the charter does provide how the corporation may be dissolved and, upon its dissolution, in what way its affairs shall be liquidated.

But this corporation has never been legally dissolved and no appoint-ment of liquidators has as yet been legally made.

Meanwhile, the application for the appointment of a receiver finds, as we have seen, justification.

For the present, at least, this company and its affairs will be safer in the hands of a receiver than it can be in the hands of those who have dealt with it in the manner as herein pointed out.

It may be that the stockholders, or the holders of three-fourths of the stock, represented at a general meeting called for the purpose, pursuant to Article 8 of the charter, may dissolve the corporation and appoint liquidators as provided in Article 7 of the charter, and it may be that after such dissolution shall have been legally accomplished and after the due appointment of such liquidators shall have been made, they (the liquidators) may apply to the court and on proper showing made ask the termination of the receivership and the turning over to them of the property and affairs of the corporation for liquidation and final settlement.

It may be that the court, on this application, and first securing the safety of creditors and shareholders by the exaction of adequate bond, might be authorized to grant such an application, end the receivership and put the liquidators in charge.

The rights of all parties in respect to these matters are reserved.

It is urged as grounds for not granting the receivership applied for that it will entail large costs and expenses to come out of an insolvent corporation, to the detriment of creditors and all concerned, except the receiver and his attorneys and the recipients of court costs.

The State Courts of Louisiana will not permit the spoliation of estates and corporations in the way of the allowance of exhorbitant charges for commissions, fees, costs, etc. Nor is it believed that, in the present case, there is any purpose or design on the part of any one to attempt this.

Rehearing refused.