Statement of the Case.
MONROE, J.
Plaintiff, as president and •director of the defendant company and as •owner of one half the stock, brought suit •against the company for the appointment of •a receiver, and against C. H. and W. P. Stock, who own the other half of the stock and who are also directors, and, respectively, vice president and secretary-treasurer of said •company, to enjoin them from usurping the functions of the board of directors, from denying him (plaintiff), as president, director, and stockholder, access to the books, papers, and documents of the company, and from using or dealing in any way with its property and assets; and a preliminary injunction •was issued as prayed for. After trial there was judgment rejecting the application for the appointment of the receiver, “without prejudice to the injunction,” which had been issued, and, plaintiff having appealed, the defendants C. H. and W. F. Stock have answered, praying that the judgment be reversed, in so far as it maintains the injunction.
It appears from the evidence that plaintiff was engaged in business as a contractor (for ■street paving, etc.), and, though unable to read or write (save his signature), had been fairly successful and had accumulated some money. Defendant W. P. Stock was a barkeeper, who, having more energy than was required in that business, had some three years before, becoming connected in business with plaintiff, expended a portion of it in handling automobiles through a firm known as Stock & Co., Limited, which was incorporated to operate saloons, hotels, and boardiug houses, to transact business connected therewith, and to deal in wines and liquors, and which, at the time that plaintiff came in contact with it, was composed of W. P. Stock, his wife, and his brother-in-law. It appears, however, that in the early part of 1911 plaintiff was disposed to retire from the business in which he was engaged, and Stock was equally disposed to retire from the barroom business, so, following some negotiations which resulted in their buying, together, two automobiles from a company of which Stock desired to be made the agent, they agreed to establish, and did establish, the defendant corporation, for the purpose of conducting garages, dealing in automobiles and automobile supplies, and engaging in other business incidental thereto or connected therewith. The capital of the company was fixed at $20,000, but it was authorized to begin business when $5,000 were subscribed. The corporate powers were vested in a board of three directors, two of whom constitute a quorum, and the first board was composed of plaintiff and the two brothers Stock made defendants, plaintiff being also designated as president of the company, C. H. Stock as vice president, and W. P. Stock as secretary-treasurer. The charter does not confer any particular powers upon these officers, nor are there any by-laws which do so, but it seems to have been understood that plaintiff would not be able to give the business a great deal of his attention for the first few weeks, and that during that period, and probably afterwards, W. P. Stock would be the more active representative of the company. In payment of his stock subscription, to the extent of $5,200, plaintiff turned over to the company his interest in the two automobiles that he and Stock or Stock & *407 Co., Limited, had bought (which interest was valued at $1,650), as, also, his interest in a certain note, valued at $392.50, and the balance of $3,157.50 (to make up the $5,200) he paid in cash. In payment of the subscription of the two Stocks, there was turned over to the company the interest of Stock & Co., Limited, in the two cars mentioned, which interest had been conveyed to C. H. Stock, and was valued at $1,466.35, their interest in the note above mentioned, valued at $392.50, an automobile valued at $600, an automobile valued at $500, and “auto accessories,” etc., valued at $220, and the balance of $2,000 (to make up $5,200) was paid in cash. Eor some reason, not explained, 51 shares of stock were issued to C. H. Stock, and but 1 share to W. E. Stock, though it appears that the means wherewith the 51 shares were paid for were furnished by W. E. Stock, who also furnished the business capacity on that side of the house.
The differences between plaintiff and W. E. Stock began with their first transactions. Plaintiff was inclined to buy a machine, and Stock wanted to sell him a “Rider-Lewis,” in order to obtain the agency of the manufacturer for Stock & Co., Limited, and, after some discussion, it was agreed that two machines should be ordered, and that plaintiff should take the one he preferred and Stock the other. After the machines had been tried, plaintiff selected the smaller one, the price of which was, say, $1,000, leaving the larger one, the price of which was about double that figure, to Stock; but, when, as the result of further intercourse, they concluded to form a corporation, and go into the automobile business together, Stock insisted upon putting his machine in in part payment of his subscription to the capital, but did not want plaintiff to use his machine for the same purpose, though for some little while after they had begun to do business, but before the charter of the corporation was adopted, he used plaintiff’s machine for the-purposes of the business as much as, if not more than, his own. He finally agreed, however, after plaintiff had declined otherwise-to go any farther, that plaintiff’s machine-should be put on the same terms as his own,, and the charter -was signed April 19, 1911. On the same day there was a meeting of the-board of directors, and a resolution was adopted to -the effect that the company should open a bank account, or accounts, in the Hibernia Bank & Trust Company and. Bank of Orleans, or both, and that:
“All moneys, notes, and other negotiable securities should be deposited in bank, the funds so deposited to be withdrawn upon the check of the company, by the president and countersigned by the secretary-treasurer.”
The secretary-treasurer did not, -however,, comply with the resolution, but kept funds-belonging to the company in his own possession, and plaintiff spoke to him about it on several occasions, telling him that the business ought to be conducted in a business-way, but getting no satisfaction. 1-Ie then insisted that the books which had theretofore been kept by Stock should be kept by an outside man, and Mb. Barangue, a friend and former employe of his, was engaged for that purpose, the company paying him $15 and plaintiff paying him $7 a week. Mr. Barangue began work June 2d, and on June 6th, plaintiff, as we infer, called the attention of the board of directors to the matter of the depositing of the corporate funds, and another resolution was passed to the effect “that all cash on hand, daily, exceeding $25 should be deposited in the Hibernia. Bank & Trust Company,” and yet it was not until June 14th, that Stock, after demand by the bookkeeper, turned over the money in-his possession for deposit. On June 16th, Mr. Stock being temporarily absent from the city, a letter came to the ofñee addressed to-the company, which was opened by the bookkeeper, and found to be from the Car bo. *409 Light Company, of Anderson, Ind., and; which reads as follows:
“We have your favor of June 13th, carrying order for twenty tanks. We ship ten of these to-day and ship the remainder. Monday. By the way, the writer’s attention is just called to the fact that we sent you two copies of ■a contract for your signature. These have not been returned. Kindly see that they are immediately signed up and returned to us for execution here. Of course, you want your contract and so do we, and, doubtless, it has been a case of oversight on your part. We would thank you for early attention,” etc.
The bookkeeper called up Mr. Stock by ■telephone, and informed him of the receipt and contents of the letter, and was told by him that he would attend to it on his return. He must have returned that day, for we find in the record a letter addressed to the Carbo-Light Company, signed “Stock & Co., Ltd., per W. F. S.,” dated New Orleans, June 16, 1911, and reading, in part, as follows:
“In reply to your favor of the 9th, we will ■say that there are several garages in this city who we expect to do business with on the tank proposition, therefore, I feel that it would be best for me to handle this through the firm which we first was figuring on handling it through, as this firm can operate independent from the automobile business and has been established in this city for several years, giving us more prestige than the firm recently organized, although the writer owns controlling interest in the two firms and they are strictly under his management, so, therefore, we will inclose you sale contract, corrected, which we hope that you will send' us copy by return mail and we will have copy. We mailed you an order, through the Automobile Livery & Sale Co., for twenty tanks, which we hope you will rush as we are very much in need of same and feel that .you ought to make these shipments f. o. b., New Orleans, as we have to sell them in tlie city at a fiat price of twenty dollars,” etc.
The letter from which, the foregoing ex•cerpt is taken was not written at the office of the defendant, where the business letters •of the company were usually written, but was written at the residence of Mr. Stock— that is to say, he testifies that it was dictated by him, at his residence, to his wife— -and he also testifies that she fell into an error in saying that he owned a controlling interest in the two companies, and that they were both strictly under his management, the fact being that that was not the case. He further testifies that his reason for having the letter written at his residence was that Mr. Barangue was not at the office upon the evening upon which the letter was written, and he explains that his reason for transferring the contract from the defendant company to Stock & Co., Limited, was that he thought it would be to the advantage of the defendant company to do the business in that way, as there were other garages which might patronize an independent concern when they would not patronize another and competing garage. Upon the other hand, it appears that Stock & Co., Limited, had really gone out of business, having sold the two barrooms which they had conducted and the automobiles which they had owned, and that it was receiving its mail and collecting some rents on certain subleases at the office of defendant. However that may be, when plaintiff was informed by Mr. Barangue of what had taken place, he was displeased, and in the name of defendant wired a lettergram to the Carbo Light Company, as follows:
“On June 16th, your letter stated you had sent us two copies of contract for handling your carbo light tanks. We note that, on June 19th, you sent communication and duplicate contracts to Stock & Co., Ltd. that are covering the same proposition, (from) which appears that something is wrong at this end. We would like to know, by day letter, our expense, just why you have changed contract from us to Stock & Co. Ltd.,” etc.
The answer, received by wire, the next day, reads:
“Answering your night letter, the change was made at request of Mr. Stock, who wrote that he owned controlling interest in both companies. We feel sure that he will explain satisfactorily when he returns to New Orleans,” etc.
There was other correspondence, pending which this suit was brought, and the Carbo *411 Light Company then withdrew from the negotiations altogether.
In the meanwhile there were other reasons why plaintiff considered that the business of defendant was not properly managed, and that his interest was in jeopardy. W. P. Stock, the secretary-treasurer, employed his brother, the vice president, as a mechanician and as superintendent in the shop at $15 a week, which was afterwards increased to $20, and plaintiff objected, for the reason that C. H. Stock had but one arm, and, as his services were charged for at the same rate as mechanicians having two arms (i. e., 75 cents per hour), the patrons of the establishment complained that their bills for repairs were exorbitant, as C. H. Stock could not do the work that another mechanician could do in the time charged. Again, W. P. and C. H. Stock had the combination of the safe, which belonged to the company, and in which the books of the company were kept, and they refused, or avoided, giving it either to plaintiff or to the bookkeeper, who in some sense represented plaintiff, because of the latter’s illiteracy. The Stocks used the automobiles of the company pretty much' as they pleased, but the bookkeeper was instructed by W. P. Stock to charge the president of the company at the rate of $4 an hour whenever he took one out, even though he proposed to exhibit it to a prospective buyer. The bookkeeper, to quote the language of his testimony, “had sweeping instructions from Mr. Stock not to recognize any orders received from Mr. Brock, in any manner, shape, or form.” And on June 26th W. P. and O. H. Stock, meeting as a quorum of the board of directors, without notice to Mr. Brock, who was the other member, and president, of the board—
“resolved, that no business transacted by the president, Richard Brock, be recognized or considered binding upon this company, unless [a word, or words, omitted in the copy] by the-vice president or secretary-treasurer.”
And a notice to about the same effect was wired to correspondents of the company in the north. It further appears that towards, the latter part of June W. P. Stock, with a Mr. Ivy, whom he seems to have employed,, took two of the machines, against the expressed wishes of Mr. Brock, out into the country, for the avowed purpose of selling them; that he took his wife, and perhaps other members of his family, with him; that Brock, after some delay, was induced to sign a check for $200 for expenses; that one of the machines was destroyed by a railroad train whilst in charge of C. H. Stock, and the other was left in a garage in an interior town, apparently as the property of the Oarbo Light Company, a number of whose tanks were sold on the trip; that it then developed that the insurance on the machine which was destroyed (being one of those which had been turned over to the defendant company by the Stocks) had never been transferred and still stood in the name of Stock & Co., Limited. Mr. Stock testifies that this was an oversight, and, as the-premium had been paid and it was considered that the owner was equitably entitled to recover on the policy, the proof of loss was made in the name of Stock & Co., Limited, though it was agreed that the machine belonged' to the defendant, and that the recovery, if practicable, would be for the benefit of defendant. Mr. Stock also testifies that he intended at the end of the trip to account to the defendant company for the commission on the sale of the Carbo Light tanks, but it appears that his trip did not end until after this suit was instituted (on July 5th), and it was only then that the company learned of his intention.
Opinion.
Without imputing dishonesty of purpose to Mr. Stock, who assumed authority which *413 was not conferred upon him, either by the charter of the company or the board of directors, and, as we think, was never intended to be conferred by the understanding between him and Mr. Brock, his failure to comply with the requirement that the funds of the company should be deposited in bank, his attempt, without the knowledge of Brock, to transfer to another concern, in which he is interested and Brock is not, a contract which was offered to the defendant corporation, his failure and practical refusal until after the institution of this suit to allow Brock access to the safe, which belonged as much to the one as to the other, his use of the machines and other property of company, whilst denying Brock a like privilege, his instructions to the bookkeeper, his action as a director, and his advice, to the correspondents of the company, denying Brock’s authority to exercise any of the powers which he himself was exercising, in fine, his usurpation of power and his exclusion of Brock from the enjoyment of his rights as stockholder, director, and president, fully justified the averments of the petition that the affairs of the corporation were being mismanaged, and that the interest of the petitioner was in jeopardy.
We are therefore of opinion that the receiver should have been appointed. Act No. 159 of 1898, § 1, par. 2.
The judgment appealed from must accordingly be reversed on that point, though it is now too late for the judge a quo to appoint the receiver, since the judge of another division of the district court has made the appointment, in a proceeding subsequently instituted, and which, having been brought to this court by appeal and argued with this case, is this day decided. Brock v. Automobile Livery & Sales Co. et al., infra, 58 South. 25, No. 19,120.
It is therefore ordered, adjudged, and decreed that in so far as the judgment appealed from rejects and denies plaintiff’s application for the appointment of a receiver and condemns him for certain costs, it be annulled, avoided and reversed, and, in so far as it maintains the injunction, it be affirmed. It is further decreed that the defendants W. F. and C. H. Stock pay all costs.