162 So.2d 589 (1964)
Warren C. WEST et al., Plaintiffs-Appellants,
v.
CERTIFIED CREDIT CORPORATION, Defendant-Appellee.
No. 10132.
Court of Appeal of Louisiana, Second Circuit.
March 5, 1964.
Rehearing Denied April 13, 1964.
*590 Cook, Clark, Egan, Yancey & King, Shreveport, for appellant.
Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for appellee.
Before HARDY, GLADNEY and AYRES, JJ.
GLADNEY, Judge.
This suit was filed September 3, 1963, by Warren C. West, Kelley Womack, and Del Cryer, stockholders of Certified Credit Corporation of Louisiana, Inc., the defendant herein, and seeks appointment of a receiver, together with conservatory relief. An order maintaining the status quo of the company was granted. After issue was joined by answer of defendant in the nature of a general denial judgment was rendered rejecting plaintiffs' demands. From that decision this appeal has been perfected.
The primary issue presented on this appeal is whether or not the activities which have occurred in the management of the affairs of the defendant corporation under the direction of Louis J. Roussel, a majority stockholder, evidences such a determined course, scheme, or plan of corporate changes and management that the charter rights of petitioners and other owners of Class "A" Common stock of the defendant corporation are in imminent danger of loss or destruction. The suit was brought under the provisions of LSA-R.S. 12:752. Upon hearing in the trial court plaintiffs also urged that the stock by which Roussel purports to control the corporation is invalid. But on this question in brief before this court it is stated: "While the validity of such stock is not directly at issue in this litigation, it is, in view of Roussel's action above discussed, a vital reason for the appointment of a receiver to investigate the internal affairs of the corporation."
During the year 1957 Certified Credit Corporation, a corporation domiciled in Columbus, Ohio, became the driving force to consolidate certain life insurance companies doing business in the northwestern portion of Louisiana. It secured the consent of several of these companies to merge into a surviving corporation to be named Certified Life Assurance Company of Louisiana, with the understanding the Ohio corporation would provide management and financial stability. The shareholders of these companies received, in exchange for their stock, shares to be issued by another corporation, Certified Credit Corporation of Louisiana, Inc. [For convenient reference, the three above-named corporations are hereinafter referred to as Certified Life, Certified of Louisiana, and Certified of Ohio]. Mergers were effected by the Colonial Western Underwriters Company, Inc., and Mid-Continent Securities, Inc., who brought into Certified Life their assets and in exchange their shareholders received shares of Class *591 "A" Common stock of Certified of Louisiana Other smaller life insurance companies followed this procedure. Certified of Louisiana was initially organized with a capital stock of 1,000,000 shares of Class "A" Common stock with a par value of 20 cents per share and 1,000,000 shares of Class "B" Common stock with a par value of one cent per share. Subsequently, on October 16, 1958, the authorized number of shares of Class "A" and Class "B" stock were 2,000,000 each. After completion of the mergers, the three corporations had the following stock distribution: Certified Life was capitalized with 250,000 shares of Class "A" Common stock, of which 176,920 shares thereof were transferred to Certified of Louisiana which had outstanding 1,538,227 shares of Class "A" Common stock issued in exchange for the stock held by the shareholders of the companies merged into Certified Life, or otherwise disposed of for value received. Two million shares of Class "B" stock had been subscribed to by Certified of Ohio at its par value of one cent per share. Certified of Louisiana had received 176,920 shares of Certified Life for the shares of Class "A" Common stock issued by it. Certified of Ohio, by purchase or subscription, had acquired 71,965 shares of Certified Life and 1,723 shares of Certified of Louisiana Class "A" Common stock, and 2,000,000 shares of Certified of Louisiana Class "B" Common stock.
Certified Life became the active operating company and conducted an extensive insurance business. Certified of Louisiana was strictly a holding company, possessing the majority of the stock of Certified Life. Certified of Ohio was strictly a holding company controlling in excess of twenty corporations including Certified of Louisiana. This control of the latter corporation was made effective by the fact that each share of Class "A" and each share of Class "B" of the stock of Certified of Louisiana entitled its holder to one vote in the affairs of the corporation. The respective rights granted by the charter to Class "A" and Class "B" Common stock of Certified of Louisiana are as set forth below.[1]
The affairs of Certified Life and Certified of Louisiana progressed well in a business way, but, during the early part of 1963, Certified of Ohio was placed in bankruptcy *592 under a Chapter X proceeding of the Federal Bankruptcy Act, and, at approximately the same time, Certified of Louisiana was placed in receivership by the Court of Common Pleas of Franklin County, Columbus, Ohio. At a bankruptcy sale on May 29, 1963, Louis J. Roussel, of New Orleans, purchased 1,723 shares of Class "A" and 2,000,000 shares of Class "B" Common stock of Certified of Louisiana for $301,101.00 and 71,965 shares of Certified Life for $229,899.00. It appears from the record that Roussel was induced to purchase this stock for the purpose of consolidating or merging Certified Life with one of the insurance companies controlled by him.
By reason of the purchase of this stock Roussel gained majority control of Certified of Louisiana, and through the latter's possession of 176,920 shares of the stock of Certified Life, a majority control of that company. He promptly directed that a shareholders' meeting of Certified of Louisiana be held in Shreveport on August 27, 1963. Notices for this meeting were sent out under date of August 9, 1963, and signed by S. O. Bruce as agent and attorney in fact for more than 60% of the stock outstanding.[2]
Roussel took into his possession the records of Certified of Louisiana and caused an audit to be made by John C. Walsh, an accountant. A copy of a balance sheet from this audit appears in the record. It fixes the stockholders' equity in Certified of Louisiana as of September 12, 1963, at $931,326.08. Apparently this valuation is based on a valuation of $15.00 per thousand on the life insurance issued by Certified Life. It is indicated by other evidence in the record that a proper value would be $25.00 to $30.00. Algie D. Brown, a stockholder and an attorney, gave his opinion that the assets of Certified Life were worth approximately $1,500,000.00.
At the stockholders' meeting held on August 27th, a large number of Class "A" shareholders appeared. Without formality, Roussel took charge, named himself chairman, and proceeded, again without formality, to name some nine directors, three of whom were from holders of Class "A" stock and the others were business associates or employees of Roussel. He advised the stockholders that the domicile of the Corporation would be changed to his office in the American National Bank Building, New Orleans. After so proceeding, he called for a discussion to consider charter changes, converting all Class "A" and Class "B" Common stock into a single class of stock. Roussel seemed to make it clear that such stock would be exchanged on an equal basis. There was a great deal of opposition to this proposal and the meeting was adjourned to September 6th, to be held in New Orleans. He announced, however, that a directors' meeting would be held September 6th in New Orleans prior to the time set for the shareholders' meeting.
On August 31st, without notice to the three directors representing the Class "A" shareholders, Roussel convened a directors' meeting in New Orleans at which meeting, *593 inter alia, the directors present purported to authorize him to borrow money for the corporation and procured the adoption of resolutions summarily dismissing from office the directors and officers of Certified Life. He likewise removed the three directors of Certified of Louisiana named at the August 27th shareholders' meeting on the stated grounds they had not indicated their written acceptance of such offices. Thereafter, on the next banking day, a loan in behalf of defendant corporation for $100,000.00 was negotiated with the American National Bank of New Orleans, which Roussel described as one of his companies. Petitioners complain that there was no need for a loan of such a size forasmuch as the corporation had a current indebtedness of only a few thousand dollars and a total indebtedness of approximately $17,000.00, $14,400.00 of which was represented by a long-term loan on the real estate owned by the corporation, and contend such interest payments will impose an unnecessary burden. Roussel pledged all of the 176,920 shares of Certified Life stock owned by Certified of Louisiana as collateral for the loan, which was evidenced by a demand note.
The foregoing circumstances reflect actions of Roussel which have disturbed the Class "A" stockholders of Certified of Louisiana. Petitioners earnestly complain that the intent and purpose of Roussel is to substantially destroy the value of their Class "A" Common stock, that they have no voice in the affairs of the corporation, and that it would be futile to bring individual suits for the purpose of securing redress.
As evidence of this they point to this testimony of Mr. Roussel:
"Q. You do not know what the relative rights of Class A and B are? Is that your statement?
"A. I know that in case of a voluntary liquidation that the Class A would get a lot more than the Class B; is that what you mean, Mr. Cook?
"Q. Yes.
"A. I know that, but I know that I would never be for that. So it wouldn't matter what it said; I am against it.
"Q. Are you willing to enter into any arrangement, sale, merger, liquidation, or otherwise, under the present charter classifications of Class A and B?
"A. No, I am not."
The Civil Code, under Title 10, "Of Corporations," states that the use of corporations is to contribute by the union and assistance of several persons, to the promotion of some object of general utility; that corporations are different and distinct from all of the persons who compose them; that what is due to a corporation is not due to any of the individuals who compose it, and vice versa; and that corporations are subject to various kinds of incapacities, some of which are inherent to their nature, others are established by law. LSA-C.C. Arts. 428, 435, 437 and 440.
Our statute with reference to business corporations, Acts of 1928, No. 250, as amended, LSA-R.S. 12:36, prescribes the proper relation of directors and officers to the corporation in the following language:
"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinarily prudent men would exercise under similar circumstances in like positions."
The trial court, in rejecting plaintiffs' demands, remarked that the actions of Roussel were to be deplored and were irregular and arbitrary, but decided that the remedy available to petitioners is to demand a new stockholders' meeting or bring a suit to set aside the election of the directors previously elected at this meeting, and *594 that this could be accomplished as well by plaintiffs as it could by a receiver.
Chief Justice Fournet summarized our jurisprudence with respect to the propriety of appointing a receiver in the case of Peiser v. Grand Isle, Inc., 221 La. 585, 60 So.2d 1 (1952), saying:
"While the provisions of subsections (2) and (11) of LSA-R.S. 12:752 set forth the causes for which a receivership may be sought by a shareholder, the appointment of a receiver is not mandatory but is subject to sound judicial discretion, Kinnebrew v. Louisiana Ice Co., 216 La. 472, 43 So.2d 798; Kohler v. McClellan, 5 Cir., 156 F.2d 908, certiorari denied 329 U.S. 781, 67 S.Ct. 203, 91 L.Ed. 670; Duval v. T. P. Ranch Co., 151 La. 142, 91 So. 656; Davies v. Monroe Waterworks & Light Co., 107 La. 145, 31 So. 694. In determining whether or not the facts justify and make advisable a receivership, in the absence of a clear showing of fraud or breach of trust the courts are slow to interfere, will order the appointment of a receiver only when it is manifest that it should be made, and are influenced by a consideration of whether such action would serve a useful purpose. Kinnebrew v. Louisiana Ice Co., supra; Reynaud v. Uncle Sam Planting [& Mfg.] Co., 152 La. 811, 94 So. 405; Duval v. T. P. Ranch Co., supra; Marks v. American Brewing Co., 126 La. 666, 52 So. 983; Stendell v. Longshoremen's Protective Union Benev. Ass'n, 116 La. 974, 41 So. 228; Meyer v. Meyer Bros., 116 La. 456, 40 So. 794; Bartlett v. Fourton, 115 La. 26, 38 So. 882; Posner v. Southern Exhaust & Blow Pipe Co., 109 La. 658, 33 So. 641. This court will not disturb the ruling of the trial judge in his refusal to appoint a receiver except in a case where it clearly appears that the interests of the minority of stockholders are in imminent danger. Kinnebrew v. Louisiana Ice Co., supra. This is particularly true where the parties have a full and adequate remedy through other means. Carey v. Dalgarn Const. Co., 171 La. 246, 130 So. 344; Allen v. Llano Del Rio Co. of Nevada, 166 La. 77, 116 So. 675; Reynaud v. Uncle Sam Planting [& Mfg.] Co., 152 La. 811, 94 So. 405; Russell v. Citizens' Ice Co., 118 La. 442, 43 So. 44; Marcuse v. Gullett Gin Mfg. Co., 52 La.Ann. 1383, 27 So. 846."
The courts in Louisiana have not always restricted the rights of a minority stockholder simply to actions at law to correct the behavior of corporate management, but even in instances of solvent corporations have directed the appointment of a receiver. Brock v. Automobile Livery & Sales Co. et al., 130 La. 404, 58 So. 21 (1912); In re Receivership of Webre-Steib Co., Limited, 136 La. 272, 67 So. 1 (1915); and Wolbrette v. New Orleans Drug Co., 151 La. 649, 92 So. 214 (1922). In the latter case the court stated:
"We do not question the power of a board of directors to define reasonably the duties of officers that it has power to elect, when they are not defined by the charter or by law; nor even, when necessary, to remove an officer that it has power to elect, but when one member of a board, with the aid of a mere dummy, does what Yates has done, another question presents itself. Under such circumstances, the action of the so-called board will be closely scrutinized; and when so scrutinized, if it appear that the action taken has resulted in that member's taking charge of the treasurer's office and discharging its duties, and that, unless relief be granted, that member will be, and will probably remain, in full control of the corporation, and that such was the purpose of that action, it will be regarded as an abuse of power, and gross mismanagement, and a receiver will be appointed. Section 1 of Act 159 of 1898."
In re Receivership of Webre-Steib Co., Limited, the court, 67 So. page 3, observed, *595 after reference to the same provisions of Act No. 159 of 1898, which give rise to petitioners' actions herein, that under such statute the fact that plaintiffs had not alleged fraud was immaterial for the reason that, under the act, with particular reference to Sections 2 and 11 (LSA-R.S. 12:752), no such allegation is required. The court commented:
"It is immaterial, therefore, for the purposes of the question here presented, whether the gross mismanagement, ultra vires acts, wasting, misusing, or misapplying of funds, or violation of charter rights specified in the statute are done purposely and fraudulently, or negligently and inefficiently; the result is the samethe innocent stockholder, or creditor, is the suffererand the intent of the law is to protect him from inefficiency and negligence, as well as from fraudulent machination."
In 19 C.J.S. verbo Corporations § 1454, page 1157, we find the following exception to the rule that the power to appoint a receiver for a corporation must be exercised with great caution, the court making this observation:
"However, the rule of extreme caution does not apply in the case of holding companies, nor where the receiver is not to interfere with the exercise of corporate power or his custody will not suspend corporate functions in any degree, and in any case it applies only to the determination of whether there is a good reason for the appointment of a receiver, and once such reason is found to exist a court will not hesitate to exercise its power."
Pertinent to this discussion is the following statement found in Thompson on Corporations, Third Edition, Volume 6, § 4628, which reads in part:
"The rule that a stockholder may not have a receiver appointed for mismanagement does not apply where the mismanagement complained of is wilful and its purpose is to ruin the corporation. A stockholder has an unquestioned right to the appointment of a receiver where the facts disclose a scheme on the part of the directors or majority stockholder to wreck the corporation and dissipate its assets. Said one of the courts, after noting the hesitancy of courts to interfere in the management of corporations: `It may further be said that this court has never denied power in a chancellor to prevent a scheme of irreparable injury and wrong, merely because the movers in that scheme speak and act in a corporate capacity rather than in an individual capacity. That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are `frozen out', that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all the stockholders, and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy, or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original corporate entente cordiale is unfairly destroyed. It would be a sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality toward one of its conflicting parties, or has put the estate in a fix it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law."
*596 We have reviewed the cases of Coleman v. La Salle Creosoting Company, La.App., 129 So.2d 311 (3rd Cir., 1961); Farwell v. Milliken & Farwell, Inc., La.App., 145 So.2d 644 (cert. granted, 4th Cir., 1962), and Best v. Southern Hide Co., 170 La. 997, 129 So. 614 (1930), which authorities were relied upon by counsel for appellees and the trial court, but we are of the opinion that these cases are inapposite, and we further observe that, at the time this opinion is being written, if the Supreme Court has passed upon Farwell v. Milliken & Farwell, Inc., the decision has not come to our attention.
It is our holding that a receiver should be appointed to protect the interests of petitioners as shareholders of Class "A" Common stock for the reason that individual actions taken to effectuate correction of the matters complained of, because of delays, expense, and inconvenience, would not be feasible. Furthermore, the defendant corporation is a holding company as distinguished from an operating company and it does not appear that a receivership will have any serious adverse effect upon its operations or that of the subsidiary corporation. Finally, we think the record makes it abundantly clear that the majority stockholder, who has placed himself in absolute control of the two corporations, Certified Credit Corporation of Louisiana and Certified Life Assurance Company of Louisiana, has indicated an intent to deprive Class "A" stockholders of their property rights and such interests appear to be in imminent danger from loss or destruction.
Our judgment requires a reversal of the decree appealed from, but we pretermit passing upon the invalidity of the issuance of the Class "B" stock formerly held by Certified Credit Corporation of Ohio. For purposes of this appeal, Roussel must be deemed to be prima facie holder and owner of such stock [LSA-R.S. 12:502], but this issue is left open for future determination.
Counsel for petitioners have requested a reasonable allowance as attorney's fees and to have taxed as cost expenses incurred, all as provided under the provisions of LSA-R.S. 12:753 B. Such relief may be granted upon consideration by the trial court.
For the foregoing reasons, this case is remanded to the First Judicial District Court of Caddo Parish for the appointment of a receiver and the allowance of fees and expenses as provided by LSA-R.S. 12:753 B. Defendant is taxed with costs of appeal, all other costs to be assessed as prescribed by law.
Reversed and remanded.
NOTES
[1] (A) The total number of shares authorized to be issued prior to October 16, 1958, was:

"(1) One million (1,000,000) shares to be known as `Class A Common Stock,' having a par value of twenty (20¢) each.
"(2) One million (1,000,000) shares to be known as `Class B Common Stock,' having a par value of one (1¢) cent each.
"(B) In the event of voluntary liquidation, only the Class A Common Stock shall participate in the distribution of the assets, equally upon a per-share basis. In the event of involuntary liquidation, assets realized shall be distributed equally to the holders of Class A Common Stock to the extent of the par value thereof, and the excess shall be delivered equally to the holders of Class B Common Stock; `equally' meaning pro rata upon the basis of the number of shares held by each recipient."
"(C) The Class A Common Stock shall be preferred in distribution of dividends to the extent of five per cent (5%) per annum of the par value thereof, but this shall not be cumulative. No dividend whatever shall be paid, however, to the holders of Class B Common Stock unless the full five per cent (5%) dividend shall have been declared and paid upon the Class A Common Stock for the preceding five (5) consecutive years. If the five-year payment provision of the preceding sentence shall have been satisfied, and the dividend declared by the Board of Directors shall be adequate to equal or exceed five per cent (5%) per annum upon the Class A shares, the holders of Class A Common and Class B Common Stock shall participate equally (as defined) in dividends.
"(D) All shares issued shall be fully paid, nonassessable, and without preference, each shareholder of either Class A Common or Class B. Common being entitled to one (1) vote for each share held.
"Without the necessity of any action by the shareholders, the corporation may from time to time through its Board of Directors issue shares of stock for cash, property, good will, etc., of the value of the full fixed consideration of the shares issued."
[2] The notice provided:

"The purposes of the special meeting of which you are hereby notified are:
"1. To elect directors to serve as such until the next annual meeting of the shareholders and until their successors are elected and qualified.
"2. To discuss any and all matters that might affect the shareholders. Especially and particularly to consider the making of all of the Class `A' Common and the Class `B' Common stock into a single class of stock.
"3. To discuss any action that might be appropriate for the benefit of the shareholders with reference to the present assets of the company especially and to wit; the 176,930 (sic) shares of Certified Life Assurance Company presently held and owned by the shareholders of Certified Credit Corporation of Louisiana, Inc.
"4. To discuss and consider the future policies of Certified Credit Corporation of Louisiana, Inc.
"5. To consider any and all matters that might affect the operations of the said Certified Credit Corporation of Louisiana, Inc., and its shareholders, and any other matters that might come before the meeting."