THOMPSON, J.
 

 This is an application by one of the three stockholders of the Dalgarn Construction Company, Inc., to have a receiver appointed under the provisions of Act No. 159 of 1898, and, in the alternative, for an involuntary dissolution of said corporation, and a -judicial liquidation under the provisions of Act No. 250 of 192S.
 

 The principal ground on which the application is made, is that the other two directors and stockholders have grossly mismanaged the affairs of the corporation, have misused, misapplied, and dissipated the funds to such an extent as to jeopardize and endanger the rights and interests of petitioner as a minority stockholder.
 

 It is alleged that the two stockholders and directors have voted and paid themselves exorbitant salaries which were out of proportion to the services rendered and which was not justified by the work performed'by them; that they have voted and paid themselves other funds out of the assets of said corporation which were not due them and which they had no right to. That they are gradually dividing between themselves the surplus funds of the corporation and in that manner liquidating the company in such a way that they will get all of the assets and petitioner will get nothing.
 

 That said two stockholders have, drawn $35 each per week, which had been allowed by resolution and which was to be carried on the books as “overhead,” but at the end of the year to be deducted from the salaries received by them. That instead of charging such weekly payments to their salary account they have charged the same to profit and loss.
 

 It is further alleged that L. M. Dalgarn, president of the corporation, did illegally and unlawfully charge said company and received from the funds of said company the sum of $21,120 as a commission for alleged services rendered the company by him in financing the work performed under a contract which the company had for certain work on the docks in the city of New Orleans.
 

 These are substantially the major charges set out in the petition. There are some less important charges made, such as incompetency to manage the affairs of the corporation and failure to keep a proper set of books and accounts and the useless purchase of automobiles, etc.
 

 The answer denies the general charge of mismanagement and misuse of the corporate funds by the two stockholders and directors, but admits that the two directors received the $35 per week each under the resolution in addition to the salaries, and that said amount was charged to profit and loss instead of being deducted from the salaries, as was provided in the resolution. It is alleged that it was understood at the time the salaries were fixed that the weekly sums should be paid in lieu of general expenses incurred in an endeavor to obtain business for the company.
 

 
 *249
 
 It is denied that the salaries of the two directors were steadily increasing, and it is alleged that the salaries are the same as they were in the year 1927.
 

 It is admitted that L. M. Dalgarn received from corporate funds the sum of $21,120, but it is alleged that said amount was authorized to be paid said L. M. Dalgarn for his services and aid in procuring the funds and credit for the material necessary to carry on and complete the contract then being executed by the company, which commission thus allowed and paid said Dalgarn amounted to about one-third of the profits made on the contract and was reasonable, proper, and customary compensation for the assistance rendered the company.
 

 It is alleged that all of the work of the company had to be performed by the two directors after Carey had abandoned his work and ceased to have anything to do with the company.
 

 The petition and two supplemental petitions contain twelve typewritten pages, and the answer contains a like number of pages. We have stated substantially, however, the main issues between the parties.
 

 After a hearing the district judge rejected the demand of the plaintiff for a receiver or liquidator, but reserved to the plaintiff all such rights as a minority stockholder or the corporation may have against the two directors to set aside and recover or reduce the allowance made by way of salary, bonus, or for expenses, received by them.
 

 The corporation was organized in 1919 with a capital, stock of ninety-nine shares of the par value of $100 each. An equal amount of said stock was allotted to L. M. Dalgarn, his son J. R. Dalgarn, and to Thomas Carey. The. three constituted the board of directors, with L. M. Dalgarn, president; Thomas Carey, vice president; and J. R. Dalgarn, secretary and treasurer. Their respective salaries were originally fixed at $7,000 per year. This salary was reduced at various times before Carey withdrew from any active management or work in the corporation on October 2, 1926.
 

 Some differences arose between Carey and the other two directors early in 1924, but at a meeting on August 29, 1924, these differences were apparently satisfactorily arranged, and the affairs moved along smoothly until the withdrawal of Carey in October, 1926.
 

 At the meeting in August, 1924, Carey and J. R. Dalgarn were each allowed a drawing account of .$35 per week in addition to their salaries, the same to be carried on the books as “overhead,” but to be charged each year to any amounts due them on their salaries. A like amount was drawn per week by L. M. and J. R. Dalgarn after Carey discontinued active participation in the affairs of the corporation, but, instead of deducting such amount each year from their salaries, the same was entered as “profit and loss.”
 

 After Carey severed his active connection with the company the remaining two directors fixed their salaries as follows: J. R. Dalgarn $8,400 per year, and L. M. Dalgarn $7,200 per year, or a total for the two of $15,600, which was $5,400 less than the aggregate original salaries of the three.
 

 It is conceded by the plaintiff that the company did a successful business from the beginning of operations up till the time he quit the company and engaged in the same kind of business for himself.
 

 And it is admitted by all parties that the corporation was perfectly solvent at the time the present application was filed.
 

 Some time in the early part of 1926 the company obtained a contract for the construction of the Poydras and Girod street
 
 *251
 
 wharves from the commissioners of the Port of New Orleans at the price of $528,000. The work on this contract commenced sometime in the summer of 1920, Carey was in active charge of this work and continued until October of that year when he quit. The work was then a little more than one-third completed. The two remaining directors completed the work, and a net profit was made on the contract of about $78,000 according to plaintiff’s statement and about $71,100 according to defendant’s statement.
 

 It is shown that, in order to finance the contract just mentioned, the company borrowed from the Canal Bank the sum of $50,-000 for which the company’s note was executed indorsed by the three directors personally. In addition to his indorsement, Carey put up as collateral certain mortgage paper of his own.
 

 After Carey withdrew from active service in the company he demanded the return of his mortgage paper and that his name be taken off of the note for $50,000. The bank then demanded that the amount of the note be reduced, and it was reduced and renewed at $40,000- At that time the company had $27,898.36 to its credit in the bank, but this credit was gradually reduced to some $14,-000. In January, 1927, the note of $40,000 was redficed by payment to $20,000.
 

 This financing of the company by the Dalgarns both before and after Carey ceased to have any part in the affairs of the company, and the further fact that L. M. Dalgarn personally guaranteed the surety company on its bond for the contract with the port commission, was made the basis for the commission of $21,120 claimed by L. M. Dalgarn and paid by a vote of himself and his son.
 

 After receiving the amount as commission, L. M. Dalgarn divided it with his son.
 

 This left approximately $57,000 in cash on hand sometime in the early part of 1927, out of which a dividend of 6 per cent, was declared and paid on the stock.
 

 No dividend had been declared during the seven years that Carey was actively engaged with the company. The surplus was permitted to accumulate from year to year, and this policy appears to have been continued after Carey left.
 

 The evidence shows that the accumulated surplus for the period from January 1, 1920, to December 31, 1926, amounted to $40,307.84. In 1927 the surplus was $110,510.77. In 1928 it was $111,557.37. In 1929 up to August 31st the surplus amounted to $102,561.11.
 

 The surplus for the several years stated, however, did not take into account the matter of property depreciation for 1927 and 1928, nor the item of $21,120 paid to L. M. Dalgarn, nor the expense for rebuilding a barge of $3,600, nor an item of $8,996.26 for loss from January 1, 1929, to August 31, 1929, and the dividend of $594.
 

 The testimony of an accountant employed to audit the books shows that the cash on hand, accounts receivable, and physical property, real and personal, on August 31, 1929, amounted to $70,027.03, whereas the liabilities and bills payable, not including the corporate stock, amounted to only $10,000.
 

 It is shown that the business of the company for 1927 after Carey had left the company amounted to $446,263.50; for 1928, $99,362.50; and for 1929, $53,022.96.
 

 It would be impossible in this opinion to review in detail all of the mass of evidence relevant and irrelevant which is contained in two volumes of nearly seven hundred pages. However, it appears from the record and from what we have stated that the company has been successful from the very beginning.
 

 
 *253
 
 That it was perfectly solvent when this application was made and was a going concern. All of which shows in our opinionj that the two directors left in charge, though they were father and son, were not subject to the accusation of bad management as a result of either incompetency or dishonesty.
 

 The plaintiffs right to the appointment of a receiver or to a dissolution of the corporation and a liquidation of its affairs can only have for a basis the alleged misuse and misappropriation of the corporate funds in payment of excessive salaries and the alleged illegal commission of $21,120.00 paid to L. M. Dalgarn.
 

 The solution of this question necessarily involves a determination of the right and power of a court to appoint a receiver to take charge of the affairs of a corporation which is-perfectly solvent and which is successfully pursuing a legitimate business and to administer the same, or to dissolve and liquidate its affairs over the protest and opposition of a majority of the stockholders.
 

 The authority to do so is claimed, first, under the provisions of Act No. 159 of 1898, and, second, under Act No. 250 of 1928.
 

 The first-mentioned statute is entitled “an Act to authorize and regulate the practice of appointing receivers of corporations under articles 109 and 133 of the constitution.”
 

 In this act there are named eleven instances in which, and conditions on which, a- receiver may be appointed by the court, only two of which are pertinent to this case and they are when the directors or other officers are jeopardizing the rights of stockholders or creditors by grossly mismanaging the business or by committing acts ultra vires, or by wasting, misusing, or misapplying the property or funds of the corporation, and when a majority of the stockholders are violating the charter rights of the minority and putting their interests in imminent danger.
 

 The title of Act No. 250 of 1928 provides for the incorporation, regulation, merger, consolidation, and dissolution of certain corporations for profit. Section 55 of this act designates seven causes in which involuntary dissolution of the corporation may be had, only one of which is pertinent to this case, and that is when the corporation has been guilty of gross and persistent ultra vires acts.
 

 It is not pretended in this case that the payment of the excessive salaries or of an excessive commission is ultra vires of the charter of the corporation. It is clear, therefore, that the act has no application in the instant case.
 

 The pertinent inquiry then is whether, under the act of 1898, the payment of extra salaries and commissions is a wasting, a misuse, or misapplication of the corporate funds which would justify or require the court to appoint a receiver at the instance of a minority stockholder.
 

 Our opinion is that the appointment of a receiver in this case is not authorized or justified under the law nor under the facts as disclosed by the record.
 

 This court has said on numerous occasions, and particularly in McCloskey v. New Orleans Brewing Co., 128 La. 197, 54 So. 738, that courts will not interfere with the acts of a corporation in the absence of a clear showing of fraud or breach of trust.
 

 In Marcuse v. Gullett Gin Co., 52 La. Ann. 1383, 27 So. 846, the court said:
 

 “There is no necessity for the appointment of a special receiver to institute actions to recover from the officers and directors of a corporation, who hold a majority of its stock, property of the corporation, which a stock
 
 *255
 
 holder charges them with having illegally diverted and appropriated to themselves as salaries.
 

 “The individual shareholder may himself bring such actions, by making the corporation, and the directors against whom relief is sought parties.”
 

 And in that same ease on page 1396 of 52 La. Ann., 27 So. 846, 851, it was said that:
 

 “Receivership as a remedy, looks rather to the prevention of future injuries, than for the redress of past grievances. If plaintiff has just reason to complain of the course pursued by the board of control in the past, it strikes us that an injunction to prevent its further continuance would be a remedy more appropriate and proper than a receivership.”
 

 What was there said is .appropriate here. If the majority stockholders are guilty of paying themselves salaries out of proportion to the services rendered and have paid unto themselves illegal commissions, the plaintiff’s remedy is a suit to bring such funds back into the treasury of the corporation and to prevent future excessive payments by injunction. It would be disastrous to the business of the corporation to throw it into an expensive receivership.
 

 In the ease of Russell v. Ice Co., 118 La. 442, 43 So. 44, the court said:
 

 “A stockholder has full and adequate remedy through action in his own name against such commissioners for an accounting or for damages for alleged misuse of the corporate property or funds intrusted to them.”
 

 In Reynaud v. Uncle Sam Planting Co., 152 La. 811, 94 So. 405, 408, the court said:
 

 “The appointing of a receiver to a healthy going corporation, is calculated to affect injuriously its business and affairs; and such should not be done where the complaining party has other adequate remedies. The statute under which the appointment in this case is sought should be strictly construed” —citing authorities.
 

 We might cite many authorities to the same effect, but these cited are sufficient to show that the complaining stockholder is not without his remedy for the acts complained of to his prejudice, and, where such is the case, courts will not undertake to manage the affairs of the corporation or to liquidate the same by the appointment of a 'receiver.
 

 The jurisprudence we have referred to and quoted from was not affected by the enactment of Act No. 267 of 1914 and its subsequent repeal by the Act No. 250 of 1928.
 

 For the reasons assigned, the judgment appealed from is affirmed at appellant’s cost.