PONDER, Justice.
 

 The plaintiffs have appealed from a judgment of the lower court rejecting their demand for the appointment of a receiver for the defendant corporation, Louisiana Ice Company, Inc. The trial judge in his written reasons for judgment, handed down when he denied a rehearing in the case, sets forth and correctly disposes of all the issues in this case. We, therefore, adopt his reasons as our opinion. We have deleted from his opinion all references to page numbers of the transcript pertaining to offerings and evidence as these references were made for our convenience.
 

 “For reasons orally assigned, we reject the demands of plaintiffs for a receivership of defendant corporation. Plaintiffs’ counsel has filed motion for rehearing accompanied by a motion that the Court give in writing its finding of facts and reasons for its judgment. With the request of the latter motion we shall proceed to comply.
 

 “Plaintiffs, Claude Kinnebrew and his sister, Mrs. Irene K. White, are minority stockholders, and the first-named an alleged creditor, of the defendant corporation. They brought this suit under Act 159 of the 1898 Louisiana Legislature (Dart’s Statutes, Sec. 1209 et seq.) which provides (in Section 1, paragraphs 2 and 11) that a receiver of a business corporation may be appointed :
 

 “ ‘2. At the instance of any stockholder or creditor, when the directors or other officers of the corporation are jeopardizing the rights of stockholders or creditors by grossly mismanaging the business * * * or misapplying the property Or funds of the corporation.’ * * *
 

 “ ‘At the instance of any stockholder when a majority of the stockholders are violating the charter rights of the minority and putting their interest in imminent danger.’
 

 “We rejected the demands of plaintiffs, because of our conclusion, based upon the evidence as a whole, that the rights and interests of plaintiffs were not being jeopardized and put in imminent danger as the result of gross mismanagement of the present officers, directors and majority stockholders of the defendant corporation. While the evidence discloses that the management of the defendant corporation’s affairs was most informal, and might, under different and normal conditions of the corporation’s affairs, be considered irregular and even mismanagement, considering the history of the corporation, the state of its affairs when the present management assumed control in October, 1944, and the conditions under which it has been forced to operate since that time, we think the Court would not be warranted in placing it in receivership.
 

 “We find, from the evidence, that the corporation was insolvent in October, 1944, in that it was unable to meet its current liabilities. Its current liabilities exceeded $25,000. including bank overdraft of more-
 
 *481
 
 than $1500. It owed in accounts payable to officers and affiliates approximately $19,-000. Its capital structure of $98,800 of issued capital stock had been largely, if not completely, absorbed by accumulated deficits. This readily appears from the evidence, including the audit of Frost & Heard, C. P. A.’s, as of August 31, 1944. We find from the evidence that the current liabilities were represented by innumerable claims in the hands of clamoring creditors. We find from the evidence that the machinery and equipment in the corporation’s ice manufacturing plant had been permitted to deteriorate and run down to the extent that it could be neither profitably nor efficiently operated without extensive and costly repairs and replacements. We find from the evidence that the corporation was without credit and its then management unable or unwilling to secure or provide the funds necessary to discharge its obligations or accomplish rehabilitation of its physical properties necessary to its further operations and corporate life. We find that the corporation’s loss in 1943 was in excess of $16,-000 and in 1944 in excess of $33,000 during which two years the.plaintiff, Claude Kinnebrew was in charge of the management.
 

 “About October, 1944, the present management entered the picture. The entry was made by their purchase from Mrs. Sudie Kinnebrew, widow of Lee Kinnebrew, former stockholder and officer of defendant corporation, of a debt due her by the corporation. At the same time, Mrs. Kinnebrew, transferred to them her stock in the corporation for a nominal amount, demonstrating the negligible market value of the stock. Thereafter, the present management assumed control. This management was composed of S. R. Morgan, Sr., his wife, Maudé W. Morgan, and their sons, S. R. Morgan, Jr. and W. E. Morgan. Charles E. Elkins is also of this management, but the real control is in the Morgan family. The Morgan family, or interests, own Consumers Ice Co., Inc., of Shreveport, and a large number of other ice manufacturing corporations and enterprises in Louisiana, Arkansas and Texas.
 

 “Thereafter, the Morgans purchased by a similar transaction a debt of the Corporation owned by the Estate of Ratcliff, also a former stockholder, officer and director. At the same time, the Estate transferred to them the former Ratcliff stock for a nominal sum, again demonstrating the practical worthlessness- of the stock.
 

 “Plaintiff, Kinnebrew continued as an officer and director of the corporation for a year or more after this change in the control of the corporation. He and Mrs. White still own about 12% of the capital stock, the Morgan interests owning the balance.
 

 “Immediately -after the assumption of control, the new management set about the expansion and rehabilitation of the manufacturing plant by the repairing and replacement of the plant machinery and delivery equipment, this was done' out of funds advanced’ the corporation by Maude W.
 
 *483
 
 Morgan. To secure these advances, the corporation executed a $90,000 mortgage to her on all of the real estate. This mortgage, however, was not executed until October 31, 1945, after the funds had been advanced. Although voting against the resolution authorizing it, plaintiff Kinnebrew, subscribed the mortgage as Secretary of the Corporation, but only after the Morgans, at his insistence, paid Mrs. White $10,000 and interest on a mortgage she held against part of the corporate real estate. This amount of $90,000 was found not to be sufficient and Maude W. Morgan, has advanced an additional $85,000 to the corporation which is unsecured.
 

 “But of these advances to the corporation its debts already referred to were paid and consolidated and a reconstruction program pursued which is about 90% complete and, when completed, is estimated to increase the plants potential capacity for ice production by more than 40%. Notwithstanding this rebuilding program, the plant has been maintained in limited operation and, according to reports of Koshkin & Levingston, C. P. A.’s of Beaumont, Texas, has returned a profit from operations each year, with the possible exception of 1948. For the fiscal years ending in 1945, 1946, 1947 and 1948, the net profit is shown, respectively to be $16,395.98, $15,328.28, $7,864.94 and $4,726.35. And, in 1948, the collapse of a huge freezing or storage vault stopped or seriously curtailed ice production for some six weeks during the summer season. The Frost & Heard audit of Aug. 31, 1933 shows a deficit of $47,426.85 charged against the capital account of $98,800, whereas, the 1948 Koshkin .report shows the deficit has been eliminated and replaced by a surplus.
 

 “It is true that the liabilities of the corporation have increased, due, of course, to the Maude W. Morgan, mortgage and open account, but, at the same time, the value of the fixed assets, particularly, machinery and equipment has correspondingly increased.
 

 “'Compared to the 1944 situation, the 1948 over-all picture represents decidedly an improved financial position and a reconditioned and expanded plant capacity for future operations.
 

 “It is to be borne in mind that plaintiffs do not seek to wind up and liquidate the corporation, but, in the prayer of their petition and in brief of their ’ counsel, express their desire that the corporation be continued as a going concern, but in receivership and not under the Morgans’ control.
 

 In Marcuse v. Gullett Gin Mfg. Co., 52 La.Ann. 1383, 1396, 27 So. 846, 851, the Supreme Court said: ‘If matters have reached the point with this company that its plant is now complete, and that it has been placed in position to operate hereafter without further outlays in that direction, the advantages of the past outlays, not now seen or appreciated, may be made to appear. The actual result remains to be seen. So far as this record shows, no one other than
 
 *485
 
 plaintiff is complaining. Receivership, as a remedy, looks rather to the prevention of future injuries, than for the redress of past grievances. * * * ’
 

 “And, again in Duval v. T. P. Ranch Co., 151 La. 142, 151, 91 So. 656, 659: ‘The appointment of a receiver for the causes set forth m section 1 of Act 159 of 1898 are not mandatory, hut are subject to judicial discretion, and a receiver should not be appointed, except in cases where it is evident that such appointment will serve some useful purpose.’
 

 “Consider now the basis upon which plaintiffs claim their rights have been and are being jeopardized. In the first place, we have heard no claim from plaintiffs or their counsel that the value of their rights has been or.is being destroyed or diminished.- We observe no denial that the very contrary is true, as defendant’s counsel contends, and as we have found to be the fact. Be that as it may, let us turn to plaintiffs’ specific claims. In Paragraph 4 of their original petition it is claimed that their rights are being jeopardized by the gross mismanagement of the defendant corporation by the Morgan group and by their wasting, misusing and misapplying the funds and property of the corporation, as follows, to-wit:
 

 “ ‘A. By failing to render reports of corporate affairs or statements of operations to ■the stockholders’
 

 “What evidence there is in the record is to the contrary. Plaintiffs offered no eviderice to support the claim and have apparently abandoned the same.
 

 “ ‘B. By suffering liens and judgments to be rendered against the corporation * * *.’
 

 The evidence shows that, with one exception, the liens and judgments referred to arose from transactions occurring prior to the time of the present management, and that, without any exception, all such liens and judgments have been paid in full by the present management and erased from the records.
 

 “ ‘C. By failing to operate said business at a profit or by operating same at a profit without paying dividends to the stockholders.’
 

 “As we havé already shown, the business was operated at a profit. As for the payment of dividends, the corporation’s first concern certainly was to devote its earnings to the payment of its debts. Any other policy would be sheer folly.
 

 “ ‘D. By executing a mortgage affecting all of the corporate assets, securing a note for $90,000 due one year after April 1, 1945, at a time when said directors well knew there was no possibility whatever of paying said note at its maturity.’
 

 “We have already referred to this mortgage. In October of 1944, as we have shown, the corporation was insolvent and the securing of additional funds was the only alternative to its becoming defunct. It had to be Mrs. Morgan’s funds or another’s,
 
 *487
 
 and it is not shown that any other’s were available on any terms. The evidence suggests the contrary. In view of the circumstances, its execution can not be reasonably held to constitute gross mismanagement. At any rate Kinnebrew signed the mortgage for the corporation and has enjoyed whatever benefits have been derived therefrom for three years prior to the filing of this suit.
 

 “Moreover, there is nothing to suggest that Mrs. Morgan has evidenced any intention of using her position as creditor under the mortgage to strangle the corporation. On the contrary, she has subsequently supplied an additional $85,000 to further aid the corporation without security. S. R. Morgan, Sr., testified that, at the time of the execution of the mortgage, the parties contemplated the time in the future if and when the condition of the corporation could command credit consideration in the usual channels to secure its refunding and amortization. We cannot anticipate the future.
 

 “‘E. By paying excessive salaries to officers of the corporation.’
 

 “Plaintiff offered no proof whatever to support such a charge. Defendant showed the only salaries paid to officers and directors to be $3600 to S. R. Morgan, Sr. for the fiscal year ending October 31, 1947, and $200.00 per month now being paid Elkins as Sec. Treas. and Manager, which is up from $120 per month previously paid him. None of the other officers and directors, all members of the Morgan family, has received any compensation, salary and fee, and the President, S. R. Morgan, Jr. who resides in New Orleans, has not charged the corporation with his travel expenses incurred on frequent trips to Shreveport on the corporation’s business.
 

 “ ‘F. By failing to regularly hold stockholders meetings and failing to give appropriate notice of such meetings to the stockholders.’
 

 “The evidence is to the contrary. The minute book was produced in court for plaintiffs’ examination. This charge has apparently been abandoned.
 

 “In paragraph 5 of the original petition, it is alleged on information and belief that the corporation is in reality operated by S. R. Morgan, husband of Maude W. Morgan. Officially, he is neither director nor officer, nor employee of the corporation and had not been since 1947. He was prior to that time employed at a small salary during part of the rebuilding program to supervise that. In view of his experience there is nothing amiss in that. He is a member of the co-partnership that purchases the entire output of the defendant’s ice plant and does occupy an office on the plant premises, paying rent therefor. We have no doubt that he does play a large part in influencing the management and operation of the plant. In view of circumstances mentioned we fail to see anything sinister per se in the situation. Is there anything wrong in the husband of a creditor of a corporation to the tune of $175,000 remain
 
 *489
 
 ing on the scene to observe the operation ■of the debtor’s business and even to advise •and aid therein? Is there anything wrong in the member of a copartnership purchasing a plant’s entire production from doing the same?
 

 “The business world is familiar with the practice of banks and other creditors of distressed corporations having representatives, observers and advisers on the scene to protect their interests and assets in the recovery of the corporation. That is not mismanagement.
 

 “In paragraph 7 of plaintiffs’ original petition it is alleged on information and belief that the Morgan family and associates, in operating the defendant corporation, have consistently sold its ice output at a price less than the prevailing market' price to Consumers Ice Company, Inc., a Morgan Company, thereby enriching themselves at the expense of the minority stockholders of the defendant corporation. There is no evidence to support this claim. Instead the evidence shows that Consumers’ Ice Company, Inc. paid more for defendant corporation’s ice than was paid it previously by City Ice Service, Inc., a distributing company which purchased the output of all the ice manufacturing plants in Shreveport, including defendant.
 

 “In paragraph 8 of plaintiffs original petition, plaintiffs allege, on information and belief, that funds of defendant corporation have been expended for insurance coverage on trucks and other property not owned by the corporation, all for the personal benefit of the Morgans. Proof of this serious charge was not attempted and it is, apparently, abandoned.
 

 “In a supplemental petition, plaintiffs make additional allegations of claimed mismanagement. In paragraph 12 it is alleged that defendant corporation kept no formal records of its operation despite advice so to do given by its auditors, Koshkin and Levenston, and that all its transactions have been handled through the records of Consumers Ice Co., Inc. The evidence does show that a complete set of books, journals and ledgers were not kept in the orthodox manner advised by the accountant, Koshkin, who testified that he was engaged in 1946 by W. E. Morgan to attempt to bring up to date defendant’s records and install an adequate system. He then prepared the audits of 1945 and. 1946, using as his basis the Frost & Heard audit of 1944. These have been heretofore referred to. In the process, Koshkin examined such original records as invoices, cancelled checks, harvest sheets etc., as were kept, and, also the records of several other companies owned or controlled by Mrs. Morgan, who had expended money for the account of defendant corporation or which had purchased its ice. These were examined and correlated with such, records as wer-e kept by defendant and the audit reports made and transferred to a. general ledger.
 

 
 *491
 
 "While proper records of the corporation were not properly recorded in an orthodox set of books, it did keep many original memoranda and records such as invoices, cancelled checks, harvest sheets, etc. Even the latter seems to have been done in a very slipshod and negligent manner, for it developed that many of these were lost or misplaced and could not be produced. The actual condition of defendant’s records is, we think fairly revealed by the testimony of Koshkin shown on pages 57 to 64 of the Evidence on Rule.
 

 “We do, in our view of thi-s case, rely greatly upon the testimony and audits of Mr. Koshkin. It is to be remembered that he is not an employee of defendant corporation or the Morgans in the ordinary sense, but is an independent Certified Public Accountant having no personal interest in this litigation. We were impressed with what appeared to us to be his fairness, disinterestedness, competency and the comprehensiveness of his work notwithstanding a few errors which were readily admitted and explained by him to our satisfaction. We are hot unmindful that Mr. Lacy, the Certified Public Accountant engaged by plaintiffs, testified in the Evidence on Rule that he could not tell from the records produced in court whether the defendant corporation had made or lost money. We imagine any other competent accountant who had not actually done the work and pursued the investigation performed by Koshkin would say the same. Even Koshkin says at page 35 of the Evidence on Rule that “there is no certainty that those records we were asked to compile truly reflected the picture that existed”, but he added, “The only thing we -can say is that it is a reasonable confirmation of what did take place.”
 

 “Koshkin’s testimony on which the conclusion is based is fairly reflected in Evidence on Rule from page 35 through page 42. It is to be borne in mind that the records of defendant corporation produced in Court and Koshkin’s original work sheets were available for the inspection and study of plaintiffs and Mr. Lacy, whose competency and integrity as a C. P. A. have not in any manner been challenged. In our opinion, plaintiffs have not shown anything reflecting upon the integrity or reasonable accuracy of the Koshkin audits, which have by him been transferred to a general ledger for the corporation.
 

 “We recognize the obvious truth of Koshkin’s observation at page 40 of Evidence on Rule that “in any set of records, no matter how well kept it would be difficult to make the assertion that these records actually reflected everything that has transpired.” That however, is no argument or excuse for the failure to keep books, and we are quite sure the witness did not make the observation for that reason, because the record shows his insistence, ever since his en.gagement with defendant corporation, on improvement in its system of records. And
 
 *493
 
 considerable improvement has resulted as the record reveals.
 

 “We held in our oral opinion, and we do so here, that the fact that a corporation fails to keep a complete set of books and records was not ipso facto such gross mismanagement as to require the appointment of a receiver. In connection with this holding we stated that we knew of no case in our jurisprudence, and had been referred to none, that held to the contrary. We referred to the case of Allen v. Llano Del Rio Co., 166 La. 77, 116 So. 675, and the court’s holding therein that the failure of that defendant to keep a full set of books did not require the appointment of a receiver.. We recognized and pointed out the patent factual differences between that and the case at bar and only referred to the case as one in which the keeping of books was discussed in connection with a receivership application and not as authority for. our holding.
 

 “In addition to the allegation of paragraph 12 of plaintiffs’ supplemental petition that no formal records were kept, it is therein alleged, also, that ‘all transactions of the corporation have been handled through the records of the Consumers Ice Company, Inc.’ The evidence does not sustain this claim. It is true that part, but by no means all, of the defendant corporation’s transactions are evidenced by debits and credits on the records of Consumers Ice Company, Inc.. In view of the fact that Consumers Ice Co., Inc., took, for most of the past four years, the total output of ice produced in defendant’s plant (at a price "equal to or above the local market price), and in view of the fact that, as the record shows, it was through Consumers Ice Co., Inc., and its bank account that Mrs. Maude W. Morgan made the advances to defendant corporation, it seems to us that the simplest way to adjust accounts is by means of such debits and credits. Surely, there is nothing inherently crooked or dangerous in such procedure. All of these were minutely examined and 'recorded by Koshkin, in his work papers and audits, the integrity of which we have already. discussed. Besides, Koshkin testified that he examined all harvest or production reports of defendant for 1947 and 1948 and recorded same in his audits and that all of these original reports were in Court with the exception of a part of those for 1947, which, the evidence shows had been misplaced or lost after he returned them. Koshkin, also testified that for the past two fiscal years (1947 and 1948) defendant’s bank account ‘reflected .deposits made for collections from the Consumer Ice Company for the ice manufactured.’
 

 “In paragraphs 13 et seq. of plaintiffs’ supplemental petition it is alleged that defendant corporation either actually produced more ice than it received credit for, or that it was mismanaged in that it did not produce as much as it should have. Much evidence was adduced in connection with this contention. It is all in the record
 
 *495
 
 and, to discuss it in detail, would consume more time and space than we deem necessary. We refer only to the nature of the evidence on this point. The only evidence offered was by the tenuous and indirect method of estimates, on the basis of consumption of gas, electricity and water, of what defendant’s plant should have produced and by reference to the production experience of other ice manufacturing plants. All of the witnesses testifying on this point freely admit that the existence of many variables, such as age of the plant, condition of the machinery, etc., would materially affect the accuracy of such computations. In view of this, of the’conditions existing at the time the present management assumed control and of the difficulties encountered since then, (which we have heretofore discussed), it is our opinion that plaintiffs have utterly failed to prove that defendant produced more ice than it received credit for or that the amount of its actual production demonstrates mismanagement. It is not inappropriate to repeat here that we think the record abundantly supports our finding that defendant’s operations since October 1944, reflect a substantial profit, whereas its operations prior thereto reveal consistent loss, deficits and deteriorations of physical properties.
 

 “Next plaintiffs complain of certain tax renditions of defendant corporation’s property and of discrepancies in the values therein and the values shown in the audit reports made to the stockholders (pars. 19, 20, 22 and 23 of the supplemental petition). It is not contended that defendant has failed to pay its just and full taxes on the basis of the actual assessments made by the assessor or that the taxing authorities have taken any action or even made complaint on this score. This could hardly be held to be mismanagement, since it is common knowledge that many taxpayers, corporate or otherwise, make renditions of palpably low values, or fail to make any renditions at all, accepting the Assessor’s assessment, as apparently was done in this case for 1948.
 

 “In the motion for rehearing filed by plaintiffs’ counsel one of the specifications charges that the Court erred,
 

 “ ‘In basing the opinion in this case on the .testimony of S. R. Morgan, Sr., in view of the fact that said party had, in effect, been impeached on trial of this case with reference to an important portion of his testimony.’
 

 “If counsel meant to charge that the Court’s opinion is based upon the testimony referred to, rather than upon the evidence as a whole, he labors under an inexplicable delusion. Our oral opinion rendered herein was, in substance, what we have here written. In both, by design, we have gone to great length to set forth, with doubtless too much elaboration, our views upon all the evidence and the whole case.
 

 “We have not, indeed, disregarded the testimony of S. R. Morgan, Sr. In our
 
 *497
 
 opinion his testimony has not been successfully impeached, save insofar as that may-have been accomplished by the admission and stipulation appearing at p. 192 of Vol. I of Evidence, wherein it is revealed that he has been tried and convicted of (1) violating the OPA law on restrictions, for which he received six months in jail, and (2) Use of the mails to defraud, in connection with an income tax matter, for which he received a sentence of thirty months. We did not fail to consider the facts in weighing the credibility of his testimony and we are quite sure that no court of justice would hold the testimony of any witness is necessarily to be wholly disregarded and given no consideration. After all, one who has been convicted of crime can speak the truth. The testimony of this witness was given the weight and consideration to which considered together with all the other evidence, we think it entitled and as we were impressed with its truth, and no more. We know of no other judicial test.
 

 “We overruled defendant’s plea of estoppel, because it was not shown that plaintiff, Mrs. White, participated in the prior management or that she was, in any manner, responsible for the condition of affairs when the present management took over. Also because it is our opinion that acts of mismanagement by Kinnebrew when he was in charge would not estop him from complaining of acts of mismanagement of a subsequent management. This plea was referred to the merits, and, since we have decided the merits of the case in defendant’s favor, it was perhaps, unnecessary to pass upon the plea of estoppel.
 

 “Prior to the trial of the case on the merits, plaintiffs’ counsel filed written motion for subpeena duces tecum of certain records and books of defendant. The motion was filed pursuant to Article 140 of the Code of Practice and is in the record. The order and the writ of subpeena are directed to the defendant corporation and not to any officer thereof, nor is any officer or other person commanded to produce the records and books sought. In due course defendant corporation filed written answer to the writ and produced therewith a large quantity of books and records, shown by said answer and as shown by -a typewritten list appearing in- the record Exhibit A. This return or answer asserts that the books and records submitted therewith are all of the records and data called for ‘which are in existence and in the possession of the defendant.’ Thereafter plaintiffs, claiming the records produced and the answer or return of defendant were insufficient, applied for and obtained a rule against defendant to show cause why the facts stated in plaintiffs’ motion for the subpeena should not be considered as having been confessed. After answer by defendant, this rule came on for trial and a volume of evidence taken thereon which is in the record, styled ‘Evidence, on Rule’, and to which reference has been herein-above made. After the trial of this rule
 
 *499
 
 and before decision thereon, the Court was requested by counsel for both sides to defer its ruling thereon until the trial on the merits and decision thereon, which the Court did.
 

 “Along with our oral decision on the merits, we recalled the rule to consider as confessed the facts alleged in plaintiffs’ motion for subpoena duces tecum. Our reasons, orally assigned then, and now repeated, are that we found from the evidence (See Evidence on Rule) that defendant corporation had produced all the records called for “which were in existence and in its possession;” and therefore, there was no refusal on the part of defendant corporation to comply with the order of the Court as contemplated in the Article 140 of the Code of Practice.
 

 “In thus assigning our reasons, we expressed doubt that we were authorized to apply the penalty of the Article 140, C.P., of considering facts as having been confessed, when the subpoena duces tecum was directed to the defendant corporation and not to any officer or other person having charge of the records. We referred to the case of Keiffe v. La Salle Realty Co., 163 La. 824, 828, 112 So. 799, 801, in which the Supreme'Court held: ‘A corporation acts only through its officers, agents, and servants, and, while it may sue and be sued in its corporate name, it cannot be compelled to respond to a subpoena duces tecum when the order does not designate the president or some officer or agent of the corporation through whom it may act.’
 

 “However, as. we stated in our oral opinion, we prefer to base our opinion upon the reasons above expressed on the merits of the rule.”
 

 Appellants contend that the amount of rent collected from property owned by the corporation accounted for in the auditor’s report is not the full amount that was collected. They rely on the testimony of Morgan on cross-examination. Morgan’s testimony is indefinite. A mere reading of this testimony shows that the witness was not certain as- to the amount of the rents collected. It is only reasonable to conclude, where no issue has been made of the.fact in the pleadings, that the witness was not prepared to answer these questions on cross-examination with any degree of accuracy. Moreover, if the appellants believed there was a concealment of the amounts collected it is strange that they did not produce the tenants and establish the true facts. The burden of proving a concealment of the assets rests on the appellants and the fact they rely on Morgan’s testimony to prove this fact does not impress us because it refutes any idea to this effect.
 

 After the submission of the case on appeal, the appellants moved to remand the case to1 take additional evidence. The motion is based on the ground that Morgan testified in a subsequent proceeding that
 
 *501
 
 the plant had a greater potential capacity and that the earnings of the corporation were in excess of what 'he had testified to on the trial of this case. The appellants also allege that the case should be remanded for receiving additional testimony from Morgan and other parties to establish the amounts of rents collected.
 

 There have been improvements made on the plant and its capacity is greater since the trial of this case. The alleged discrepancy in the testimony as to the earning capacity is easily explained when the replacement value of the capital structure, the absorption of the loss suffered by the collapse of the plant and the depreciation during three years is taken into consideration.
 

 We cannot remand the case to enable the appellant to take additional evidence as to the rents collected because he had ample opportunity to prove these facts on the trial of the case and we are not disposed to permit litigants to try their cases by piecemeal and continue protracted litigation as to facts that could have been established on the original trial.
 

 For the reasons assigned, the judgment • of the lower court is affirmed at appellants’ cost.