129 So.2d 311 (1961)
James E. COLEMAN, Plaintiff-Appellee,
v.
LA SALLE CREOSOTING COMPANY, Inc Defendant-Appellant.
No. 230.
Court of Appeal of Louisiana, Third Circuit.
April 17, 1961.
Rehearing Denied May 9, 1961.
*313 Ward-Steinman & Crenshaw, by Irving Ward-Steinman, Alexandria, for defendant-appellant.
Gaharan & Richey, by L. W. Richey, Jena, for plaintiff-appellee.
Before TATE, FRUGE and CULPEPPER, JJ.
FRUGÉ, Judge.
This suit was instituted by James E. Coleman, owner of four shares of stock in the defendant corporation, to appoint a receiver for the corporation per LSA-R.S. 12:752(11). LSA-R.S. Section 752 provides the grounds for appointment of a receiver. It provides that:
"All district courts may appoint receivers to take charge of the property of corporations, and of the property of foreign corporations actually located herein under the following conditions: * * *
"(11) At the instance of any shareholder when a majority of the shareholders are violating the charter rights of the minority and putting their interests in imminent danger."
The facts are substantially these: LaSalle Creosoting Company, Inc. was organized in May, 1957. The initial stock issued was in the proportions of 40% to George D. Cobbs, 40% to James E. Coleman, and 20% to Thomas Bell. James E. Coleman, who worked as an inspector at a creosoting plant, conceived the idea of creating a creosote plant of his own. Since he was unable to finance the project, he discussed the proposition with Mr. Cobbs. Cobbs became involved in the project as the financial backer thereof. With Cobbs furnishing the capital, construction was begun of a creosoting plant. The corporation was incorporated and Mr. Cobbs was elected President; Coleman, Vice-President; and Thomas Bell, Secretary. Coleman (who was employed by another creosoting plant) assisted with the construction of the defendant plant and gave general supervision and advice. The record further reveals that Coleman acted as general manager of the corporation, supervising the work and as salesman, and that Bell assisted him in those endeavors. In the beginning none of the officers were paid, or employed directly by the corporation. However, a few months later, Coleman was required to resign his position with his employer and devote full time to the work of the defendant-corporation. His salary was fixed at $350 per month. His salary with his former employer was approximately $450 per month ($100 of which was reimbursed car expenses). Records of the corporation were kept at the business establishment of Mr. Cobbs, who operated another business (not associated with the defendant corporation). During the lifetime of the corporation Mr. Cobbs furnished money, evidenced by interest bearing notes, and signed by Mr. Cobbs personally. The testimony is to the effect that Mr. Cobbs loaned approximately $41,000 to the defendant company during the period in question.
In the early part of June, 1960, Mr. Cobbs, as President, called Bell and Coleman into his office for an informal meeting. At that time he asked both Coleman and Bell to surrender their stock to him. However, Coleman refused to do so. Cobbs gave as his reasons for wanting the stock that the business was not making money and that he had to have all of the stock in the corporation for the purpose of financing the corporation. That is, that he could no longer borrow on his name as he had his personal property mortgaged as much as the banks would allow, and he was being pressed for and needed money. On June 24, 1960, Cobbs again called Bell and Coleman into his office and another informal *314 meeting was held. Minutes of this meeting were kept and they show that all informalities were waived. The minutes show that it was moved and seconded that the stockholders take up their subscriptions and that if any stockholder did not pay the amount required to perfect his stock subscription, the stock would be sold to others. The Articles of Incorporation show that Cobbs had subscribed to forty shares; Coleman to forty shares; and Bell to twenty shares. The Articles further show that Cobbs had paid for four shares; Coleman, four shares; and Bell two shares. These minutes also show that seven days notice (as required by the Articles of Incorporation) was to be given to Cobbs, Coleman and Bell to purchase the remainder of their stock subscription. In order to complete the purchase of subscribed-to shares Cobbs had to purchase 36 shares at a cost of $3,600; Coleman 36 shares at a cost of $3,600; and Bell 18 shares at a cost of $1,800. The minutes also show that it was resolved, that since it was necessary to have more funds, that seven days notice be given to purchase and pay for another stock issue, to be issued proportionately to preemptive rights and that for stock not purchased during this seven days, any stockholder or other person would be permitted to purchase the stock. (See LSA-R.S. 12:28.) The offer was that Cobbs was to purchase an additional sixty shares, at a cost of $6,000; Coleman, sixty shares at a cost of $6,000; and Bell, thirty shares at a cost of $3,000. The notice, per the Articles of Incorporation, was duly sent and received. On July 16, another meeting was called by President Cobbs at which the result of the notices (sent out pursuant to the resolution of the corporation at the meeting of June 24, 1960) were tabulated. Coleman received no notice of this meeting. At this meeting Cobbs purchased the thirty-six shares of stock to complete his original stock subscription, and the additional sixty shares; said purchase was evidenced on the books of the corporation as a credit on the indebtedness of the corporation to Cobbs. Coleman, who had been notified to take up the stock subscription and to purchase the extra shares to be issued failed to appear at the meeting, and/or to accept the terms and provisions of his signed subscription. At this meeting it was moved and seconded that Nettie Knippers Cobbs be allowed to purchase his (Coleman's) thirty-six shares originally subscribed to by him, and the prorata amount of sixty shares additionally offered to him for the sum of $9,600. This purchase was also to be evidenced on the books of the corporation as a credit on the indebtedness of the corporation to Cobbs. Bell exercised his subscription pledge and purchased the eighteen subscribed-to shares and the additional thirty shares; this purchase was evidenced on the books of the corporation as a credit on the indebtedness of the corporation to Cobbs. At this meeting, Cobbs was also authorized to borrow whatever funds were needed to keep the corporation solvent and to pledge the assets of the corporation; if Cobbs had to personally warrant money borrowed, the corporation agreed to reimburse Cobbs for any amounts and warrants paid by him.
On July 19, 1960, another meeting of the corporation was held. Coleman was not notified of this meeting. This meeting was called to discuss finances, additional financing, and the issuance of stock per the Articles of Incorporation, and subsequent stock subscriptions and to amend the original Articles of Incorporation. At this meeting a motion was passed to amend the Articles of Incorporation for the purpose of dropping Coleman as agent for service of process; to change the capitalization of the corporation to $25,000; to name the new directors and their terms of office; to add a provision that stockholders could express themselves by majority vote, and to list the total stockholders as of that date. It was also moved and unanimously passed that Cobbs be re-elected President and Director; that Nettie Knippers Cobbs be elected Vice-President; that Bell be elected director, Secretary and Treasurer and that he could sign as Secretary or Treasurer. It *315 was also moved that at the first opportunity the stock certificates should be issued as previously subscribed and paid for; that the directors adopt a set of by-laws and set forth the by-laws; that the obligations and past indebtedness of the corporation as evidenced by its notes, chattel mortgages, loans, and open accounts, be re-organized or refinanced as best practical and the corporation placed on a firm financial basis and footing; this to be done through the President, Mr. Cobbs.
A special meeting of the corporation was called and held on August 25, 1960. Coleman was not notified of this meeting. There it was resolved that: An audit be made of the books of the corporation from its inception to the present date; that interest on the outstanding notes be properly computed through July 16, 1960 on the $24,000 stock check-off; that interest on the balance of the notes be properly computed through August 31, 1960; that a true and correct financial statement be made; that one note by the corporation be issued to George Cobbs covering the remainder outstanding notes due by the corporation with the interest properly computed; that the $1,000 with which the corporation started in business and borrowed from George Cobbs be charged against the notes held by George Cobbs against the corporation. Cobbs was specifically directed and authorized to give effect to the above.
Plaintiff maintains that at the meeting of June 24, 1960, he was told by Cobbs to put up $9,600 within seven days or his 40% interest in the company would be reduced to 1.6%. He further testified that Cobbs explained that even if he did put up that amount of money, it "still would not be enough!" Subsequent to the June 24, 1960 meeting, Coleman was not given notice either as a director or a stockholder that the meetings were going to be held.
Plaintiff filed suit to put the corporation in receivership alleging that the actions above mentioned were in accordance with a conspiracy, i. e. "an illegal conspiracy to oust your petitioner as an officer and director of said corporation and to deprive him of his rights as a minority shareholder therein"; and that further in the conspiracy Cobbs and Bell committed certain illegal acts which he set forth, to-wit:
That Cobbs and Bell had caused to be recorded in the Charter Records of LaSalle Parish a document entitled "Amendment to Charter" of LaSalle Creosoting Company, Inc.; that in this document they had attempted to illegally increase the capitalization of the corporation to $25,000; to create and set up a new board of directors without an election by the shareholders, and to increase the terms of office to three years; to declare that all matters voted upon by the shareholders should be by majority vote of the shareholders of record at the time of voting; to declare Cobbs, his wife (Nettie Knippers Cobbs) and Bell, to be the owners of 240 shares of stock that had been declared to have been previously issued. He further alleged that Cobbs and Bell had illegally and without authority attempted to create by-laws of the corporation; that Cobbs and Bell had no authority to execute or create amendments to the charter of the corporation or to enact by-laws thereof; and that such action had been only for the purpose of unlawfully depriving petitioner of his rights as a stockholder, director and officer of the corporation; that the additional 240 shares of stock declared to have been issued in the amendment to the charter, had in fact not been issued and that if they had that no consideration or payment had been made for the stock; that he, Coleman, had been discharged as Vice-President and employee of the corporation; that Cobbs and Bell had refused to allow Coleman to examine the books of the corporation; that these acts violate the rights of petitioner and that he is entitled to have a receiver appointed to take charge of the property of the corporation and administer the same to the best interests of all the shareholders or liquidate same as the exigencies of the situation may require. He further alleged that he had been the owner *316 of 40% of the corporation and therefore would participate in 40% of the fruits through the ownership of the stock, but that through the illegal acts of Cobbs and Bell, plus their mismanagement of the corporation, that he has been and is being deprived of substantial sums which he has earned; and that because of the illegal acts of Cobbs and Bell, petitioner is unable to examine the books to determine the nature and extent of the damages and reserved the right to claim such damages from the corporation as the facts might show him entitled to. The prayer was that the court order the defendant corporation to show cause why a receiver should not be appointed to take charge of the corporation and administer it, or to liquidate the corporation. (To this petition various exceptions were entered and rulings to the exceptions made by the court. However, in view of our holding herein, it is unnecessary for us to consider the relative merits of the exceptions and rulings made thereto.) Defendant filed an answer generally denying the allegations of the petition of plaintiff, and affirmatively answered thusly: That although the plaintiff is the record holder, he is not the owner of the four shares of stock that he claims to own, and therefore the stock should be revoked, cancelled or surrendered; that the directors had met, and by two-thirds vote the stock subscribers had been called on to complete their subscriptions; that due notice to complete the subscription had been given to plaintiff; but that plaintiff had failed to exercise the option and refused to complete or pay for the stock as subscribed-to in the charter; the corporation further alleged that all actions thereof had been authorized by the charter and were pursuant to law. In reconvention the corporation claimed that Coleman owed it $300 and also for the payment of four shares of stock at $100 for a total of $700; that defendant in reconvention, Coleman, has retained an automobile owned by the corporation, title being in the corporation and having been paid for by the corporation, but that Coleman refused to surrender the car; that Coleman had refused to surrender a certain gasoline credit card and had in fact charged gasoline in the amount of $40.22 which was billed to the corporation; that therefore the total owed by Coleman to the corporation is $740.22; the corporation further alleged that plaintiff in the main demand had come into court with "unclean hands" and therefore invoked the equity doctrine against said plaintiff, Coleman. The defendant therefore prayed to have plaintiff's main demand rejected at his cost; for judgment against Coleman in the amount of $740.22; that he be required to surrender the gasoline credit card; that he be directed to return the automobile to the corporation; that if Coleman did not pay the $400.00 owed for the four shares of stock, that he be directed to surrender them to the court; and for other necessary relief.
The trial court, after discussing the facts and certain cases applicable thereto, stated that: "The Court feels that the only question to determine is whether the actions of the majority stockholders were proper and whether the result operates to place the minority stockholder's rights in danger." The trial judge then concluded that:
"From a careful study of the facts and evidence, the Court comes to the conclusion that such is the case. The action taken by the majority stockholders without notice to the minority holder has reduced his interest in the company from forty (40%) per cent to approximately one and six-tenths (1.6%) per cent. Certainly he should have his rights protected by the Court. The dissension between the stockholders has become so great that an impasse has been reached. A receiver should be appointed to take charge of the property and business of the company and directed to hold, administer, and operate the plant for the benefit of the creditors and the stockholders."
He then rendered judgment appointing a receiver, with bond, and ordering Cobbs, et al., to turn over all the property of the corporation to the receiver; that an inventory *317 be made and filed; that the receiver have the power to continue the business of the corporation and to do all things associated with continuation of such business; the judgment then listed the things which he could do included amongst which was the power to file such suits or actions necessary to protect the rights of the corporation and/or the rights of any of the shareholders or creditors of the corporation. After the appeal had been taken, on joint motion of Coleman and the LaSalle Creosoting Company the trial judge ordered that the receiver be authorized to continue the ordinary business activities of LaSalle Creosoting Company during the pendency of the appeal. It may be well to note that the judgment did not mention an eventual dissolution or liquidation of the defendant corporation.
We deem it appropriate to state the general law in relation to the appointing of a receiver in cases of a violation of LSA-R.S. 12:752(11). In a 1952 case, Peiser v. Grand Isle, 221 La. 585, 60 So.2d 1, 3, Chief Justice Fournet had occasion to review the law relative thereto. He concisely stated the law to be that:
"While the provisions of subsections (2) and (11) of LSA-R.S. 12:752 set forth the causes for which a receivership may be sought by a shareholder, the appointment of a receiver is not mandatory but is subject to sound judicial discretion. Kinnebrew v. Louisiana Ice Co., 216 La. 472, 43 So.2d 798; Kohler v. McClellan, 5 Cir., 156 F.2d 908, certiorari denied 329 U.S. 781, 67 S.Ct. 203, 91 L.Ed. 670; Duval v. T. P. Ranch Co., 151 La. 142, 91 So. 656; Davies v. Monroe Waterworks & Light Co., 107 La. 145, 31 So. 694. In determining whether or not the facts justify and make advisable a receivership, in the absence of a clear showing of fraud or breach of trust the courts are slow to interfere, will order the appointment of a receiver only when it is manifest that it should be made, and are influenced by a consideration of whether such action would serve a useful purpose. Kinnebrew v. Louisiana Ice Co., supra; Reynaud v. Uncle Sam Planting & Mfg. Co., 152 La. 811, 94 So. 405; Duval v. T. P. Ranch Co., supra; Marks v. American Brewing Co., 126 La. 666, 52 So. 983; Stendell v. Longshoremen's Protective Union Benev. Ass'n, 116 La. 974, 41 So. 228; Meyer v. Meyer Bros., 116 La. 456, 40 So. 794; Bartlett v. Fourton, 115 La. 26, 38 So. 882; Posner v. Southern Exhaust & Blow Pipe Co., 109 La. 658, 33 So. 641. This court will not disturb the ruling of the trial judge in his refusal to appoint a receiver except in a case where it clearly appears that the interests of the minority of stockholders are in imminent danger. Kinnebrew v. Louisiana Ice Co., supra. This is particularly true where the parties have a full and adequate remedy through other means. Carey v. Dalgarn Const. Co., 171 La. 246, 130 So. 344; Allen v. Llano Del Rio Co. of Nevada, 166 La. 77, 116 So. 675; Reynaud v. Uncle Sam Planting & Mfg. Co., 152 La. 811, 94 So. 405; Russell v. Citizens' Ice Co., 118 La. 442, 43 So. 44; Marcuse v. Gullett Gin Mfg. Co., 52 La.Ann. 1383, 27 So. 846." (Emphasis added.)
In the case of Kohler v. McClellan, 5 Cir., 156 F.2d 908, 913, it was stated that:
"What a receiver might do, petitioner as a shareholder may himself do. Petitioner, therefore, is not without his remedy for the acts complained of to his prejudice. Under such circumstances Louisiana courts have uniformly held that the `courts will not undertake to manage the affairs of the corporation or to liquidate the same by the appointment of a receiver.'"
Furthermore, receivership of a corporation, as a remedy, looks only to the prevention of future injuries rather than to the redress of past grievances, Kinnebrew v. *318 Louisiana Ice Co., 216 La. 472, 43 So.2d 798.
In the case at bar the call for the original shareholders to pay for their subscribed-to shares of stock and the call for them to purchase within seven days their pro-rata shares of stock was issued in the due course of a meeting held on June 24, 1960 which was properly called, and of which all stockholders had been notified. At that meeting, of the stockholders and/or directors, it was properly resolved that the subscriptions be taken up and the stockholders buy their pro-rata shares to be issued. Seven days notice was given to all three of the stockholders. Plaintiff, Coleman, did not respond to this call to take up the stock subscription or to act on the prorata stock issue. Regardless of the legality or illegality of subsequent meetings and actions of the corporation, the plaintiff has lost his right to increase the number of shares he owns either by buying-in those shares of stock which he had subscribed to or the pro-rata number of shares which he was entitled to per the motions of the June 24, 1960 meeting. With respect to having more shares of stock paid in, plaintiff has lost his right to complain thereof for his failure to act accordingly in response to the notice, either by purchasing or by proper legal action to enjoin the stock issue.
Plaintiff has adequate remedies at law to correct the actions of the Board of Directors and/or stockholders taken without notice to him, if they be illegal. The result of the July 16, 1960 Board of Directors' meeting was to authorize the issuance of shares of stock to Cobbs for the indebtedness of the corporation to Cobbs. (As to those shares issued to Nettie Knippers Cobbs and Bell, the same method was used in authorizing the issuance of shares of stock.) The same applies to the July 19, 1960 meeting at which the Articles of Incorporation were amended, election of new officers were held, by-laws adopted, and other actions taken and the same holds true of the August 25, 1960 corporate meeting. In the case of Reynaud v. Uncle Sam Planting & Mfg. Co., 152 La. 811, 94 So. 405, 407, that Court quoted from "High on Receivers" (4th ed.):
"* * * The effect of appointing a receiver being to take the property of the corporation out of the control of its own officers to whom it has been entrusted by its stockholders, the courts proceed with extreme caution in the exercise of so summary a power, and in construing such statutes they are inclined to give them a strict construction. * * *
"A minority of the stockholders of a corporation is not entitled to a receiver because of dissatisfaction with the policy and management of a majority of the officers and directors in the absence of any showing of fraud or insolvency. And especially will the appointment of a receiver be denied where a corporation is solvent and its business prosperous, and it is not sought to have it wound up, since, in such case, the wrongs complained of may be remedied under the ordinary powers of a court of equity and without the appointment of a receiver. * * *

"The appointing of a receiver to a healthy going corporation, is calculated to affect injuriously its business and affairs; and such should not be done where the complaining party has other adequate remedies. The statute under which the appointment in this case is sought should be strictly construed. (Citations omitted.)
"The petitioner in this case had ample remedy under the statutory law for the recognition of his rights. (Citations omitted.)" (Emphasis added.)
That court went on to say that where the claims of the stockholder have ultimately to be determined in court actions, the shareholder should not be permitted to *319 avail himself of the harsh remedy of a receiver, unless the right thereto is free from all reasonable doubt. In the case of Carey v. Dalgarn Const. Co., Inc., 171 La. 246, 130 So. 344, 348, after citation and discussion of appropriate authority, that court stated:
"We might cite many authorities to the same effect, but these cited are sufficient to show that the complaining stockholder is not without his remedy for the acts complained of to his prejudice, and, where such is the case, courts will not undertake to manage the affairs of the corporation or to liquidate the same by the appointment of a receiver."
The powers given to shareholders under our corporation act, embodied in LSA-R.S. Title 12 and the jurisprudence of this state is sufficient to enable plaintiff to remedy the evils of which he complains by appropriate court action. If we were to allow the receivership to proceed it would be necessary for the receiver to take those very same actions which would be required of the complaining shareholder in this case. To allow the receiver to manage the corporation, and in doing so to annul or have rescinded the transactions of which the plaintiff complains, would be to create an expensive machinery to do for plaintiff, through another, i. e. the receiver, that which he can do himself directly. As stated above, the plaintiff has lost his preemptive right to the shares to which he had subscribed and to the pro-rata shares offered at the June 24, 1960 meeting. At this point, without the effect of subsequent meetings, plaintiff's position in the corporation is still that of a forty (40%) per cent share owner. If the actions taken at subsequent meetings were invalid, as alleged by plaintiff, then in appropriate suits, he may have them rescinded and his position in the corporation maintained as it was prior to the complained of actions. If he be successful in these suits, that is, in having those meetings and resolutions passed therein revoked, then in such case the corporation, or rather the board of directors, after properly called meetings may accomplish the purpose that they have set out to do. Upon proper notice to interested parties (stockowners) a Board of Directors may pass a resolution to the effect that subscriptions to shares of stock must be taken up and may authorize the issuance of shares of stock on a pro-rata basis amongst the stockholders; and upon failure of any shareowner to exercise his right to purchase these shares of stock within the time allotted under the Articles of Incorporation, or the by-laws, the Board of Directors may then authorize that the shares of stock be issued to other shareholders and/or others. And, in doing so a shareholder may very well be placed in the position that Coleman is at present. In that case, nothing is illegal and the shareowners have nothing to complain about.
In view of the fact that plaintiff is seeking a receivership and that the receiver will have to do those things which plaintiff himself could have done to rectify any alleged invalid actions taken by the corporation, this court does not find that it is necessary that a receiver be appointed. The order appointing a receiver did not set forth that it envisioned an end to the receivership or a liquidation of the corporation, but merely, created a receivership, i. e. appointed a receiver and gave him authority to manage and continue the business as it had been previously. Furthermore, the corporation appears to be on the verge of becoming solvent and successful. Therefore, since neither parties desire that the corporation be liquidated, but rather desire that it continue to progress as it has, we do not deem this to be a proper case in which a receiver should be appointed. While it is true that it is a good ground for the appointment of a receiver to a corporation when it appears that a majority of the shareholders are violating the charter rights of the minority and putting their interests in imminent danger, nevertheless, since the appointment of a receiver *320 to a healthy going corporation takes the property of the corporation out of the control of its officers to whom it has been entrusted by its stockholders and is calculated to affect injuriously its business and affairs, where it is not sought to have the corporation wound-up and where the complaining minority stockholder has other adequate remedies at law and is not without his rights in proper court proceedings, the courts will not undertake to manage the affairs of the corporation and a receiver will not be appointed.
For the foregoing reasons the judgment appealed from is reversed and the plaintiff's suit dismissed at his cost and defendant's reconventional demand is non-suited.
Reversed and rendered.

On Application for Rehearing.

En Banc. Rehearing denied.